JS 44   (Rev. 10/20)   **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Robert Julian-Borchak Williams

**DEFENDANTS**

City of Detroit, a municipal corporation, Detroit Police Chief James Craig, in his official capacity, and Detective Donald

**(b)** County of Residence of First Listed Plaintiff   Oakland
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Wayne
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Michael J. Steinberg(P43085) - U of M Law 701 S. State
St., Ann Arbor, MI 48109     734-763-1983

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☐ 2  U.S. Government
  Defendant
- ☒ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Sec. 1983

Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions:)*   JUDGE   Laurie J. Michelson   DOCKET NUMBER   20-12711

DATE

04/13/2021

SIGNATURE OF ATTORNEY OF RECORD

/s/ Michael J. Steinberg

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROBERT JULIAN-BORCHAK WILLIAMS,

        Plaintiff,                      Case No.

v.                                 Hon.

CITY OF DETROIT, a municipal corporation,
DETROIT POLICE CHIEF JAMES CRAIG, in
his official capacity, and DETECTIVE       **JURY TRIAL DEMANDED**
DONALD BUSSA, in his individual capacity,

        Defendants.

_____
/

Michael J. Steinberg (P43085)
Jeremy Shur*
Deborah Won*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
jshur@umich.edu
debwon@umich.edu

* Student Attorney practicing pursuant to
Local Rule 83.21

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties
  Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org

Nathan Freed Wessler
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

_____
/

# COMPLAINT

## INTRODUCTORY STATEMENT

1.  This wrongful arrest and imprisonment case exemplifies the grave harm caused by the misuse of, and reliance upon, facial recognition technology. Plaintiff Robert Williams was falsely arrested because, as Detroit police officers later admitted, "the computer got it wrong" and erroneously identified him as the suspect in a watch theft investigation. Nonetheless, officers secured a warrant for Mr. Williams's arrest without providing the authorizing magistrate with critical information about deficiencies in the investigation and how facial recognition technology was used. As a result, Mr. Williams was arrested without explanation on his front lawn in plain daylight in front of his wife and children, humiliated, and jailed in a dirty, overcrowded cell for approximately 30 hours where he had to sleep on bare concrete—all for no reason other than being someone a computer thought looked like a shoplifter.

2.  Mr. Williams is a 43-year-old Black man who lives with his wife of 11 years and two young daughters in their home in Farmington Hills, a suburb of Detroit.

3.      On January 9, 2020, when Mr. Williams drove into his driveway after a day

at work, two Detroit police officers arrested him in front of his family for a

crime he did not commit. The officers then transported him to Detroit and

locked him up in jail for 30 hours before releasing him on a personal bond,

but with his criminal charge still pending.

4.      Mr. Williams was falsely accused of having shoplifted watches from a

Shinola store in Detroit. The crime occurred on October 2, 2018, over a year

before his arrest. The theft had been captured by a Shinola surveillance

camera. The surveillance footage is poorly lit, and the shoplifter never

looked directly into the camera. Nonetheless, a Detroit Police Department

detective had a grainy photo made from the surveillance video. He then had

the photo run through facial recognition technology, which incorrectly

identified Mr. Williams as a possible match.

5.      It is well documented that facial recognition technology is flawed and

unreliable under the best of circumstances. That, in part, is why many

jurisdictions ban its use. According to Defendant Detroit Police Chief James

Craig, "If we were just to use the technology by itself, to identify someone, I

would say 96 percent of the time it would misidentify." And facial

recognition is especially unreliable when attempting to identify Black

people, when the photo used is grainy, when the lighting is bad, and when

3

the suspect is not looking directly at the camera—all circumstances that were present here.

6.   It is also widely accepted that a "match" by facial recognition technology does not constitute probable cause to arrest a person. Probable cause must be established through independent means by obtaining reliable corroborating evidence. Indeed, as Chief Craig testified in a Board of Police Commissioners hearing, Defendant Detective Donald Bussa, who was responsible for the investigation and who essentially relied entirely on facial recognition, performed "clearly sloppy, sloppy investigative work," causing Mr. Williams's wrongful arrest.

7.   The entirety of Detective Bussa's "investigation" can be quickly described. Defendant Bussa did not perform even a rudimentary investigation into Mr. Williams's whereabouts during the shoplifting incident; had he done so, he would have learned that Mr. Williams was driving home from work outside of Detroit during the event in question and could not have been the culprit. Instead, based on the questionable facial recognition technology "match," Defendant Bussa obtained Mr. Williams's expired driver's license photo from the Secretary of State's Office and had a six-person photo array prepared with five other photos. Then, Defendant Bussa arranged a photo lineup with a security contractor who was not even present in the store on

4

the day of the crime, and who had only watched the same grainy surveillance video that was already in Detective Bussa's possession.

8. When that person picked Mr. Williams from the lineup, Defendant Bussa prepared a request for an arrest warrant. The warrant request was faulty and misleading because Defendant Bussa hid the fact that the person who picked Mr. Williams out of the lineup had never actually seen the shoplifter in person. Moreover, while Defendant Bussa mentions the facial recognition "hit," he omits any mention of the many facts that cut strongly against the reliability of the facial recognition search. On the basis of Defendant Bussa's misrepresentations and omissions, a magistrate issued a warrant that led to Mr. Williams's humiliating arrest and incarceration.

9. Despite facial recognition technology's well-known flaws, when the Detroit Police Department began using facial recognition technology, their policy did not offer quality control standards, ensure peer review, or offer detectives adequate training. Nor did the policy direct officers on whether or how to corroborate possible leads. Chief Craig has since publicly stated that the Detroit Police Department changed its policy to ensure that wrongful arrests like the arrest of Mr. Williams would never happen again.

10. Mr. Williams brings this action under 42 U.S.C. § 1983, for violation of his Fourth Amendment right to be free of unlawful seizures. He also asserts

violations of the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws

§ 37.2302(a), which demands that no governmental entity "deny an

individual the full and equal enjoyment" of its public services on the basis of

race. He seeks damages to compensate him for his unlawful and humiliating

arrest and imprisonment, punitive damages against Defendant Bussa for

recklessly disregarding his rights, attorneys' fees pursuant to 42 U.S.C. §

1988, and declaratory and injunctive relief to prevent similar

unconstitutional arrests in the future.

### JURISDICTION & VENUE

11.    Because this civil rights action arises under the United States Constitution,

this Court has jurisdiction under Article III of the Constitution and under 28

U.S.C. §§ 1331 and 1343(3) and (4). The relief sought is authorized by the

United States Constitution and by 42 U.S.C. § 1983.

12.    This Court has supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367.

13.    Declaratory relief is authorized under 28 U.S.C. §§ 2201 and 2202.

14.    Venue is proper in this Court according to 28 U.S.C. § 1391(b) because most

incidents, events, and occurrences giving rise to this action occurred in the

Eastern District of Michigan and because all Parties are domiciled in the

Eastern District of Michigan.

6

## PARTIES

### Plaintiff

15.  Plaintiff Robert Williams is a 43-year-old father of two young girls and a
     husband of eleven years who lives in Farmington Hills, Michigan.

### Defendants

16.  Defendant James Craig is the Police Chief of the City of Detroit. He is sued
     in his official capacity.

17.  Defendant City of Detroit is a municipal corporation in the State of
     Michigan.

18.  At all times relevant to this Complaint, Defendant Donald Bussa was
     employed as a detective with the Detroit Police Department. Defendant
     Bussa is sued in his individual capacity.

## FACTUAL ALLEGATIONS REGARDING FACIAL RECOGNITION TECHNOLOGY

### The Many Flaws of Facial Recognition Systems

19.  It is well-documented that facial recognition systems are deeply flawed.

20.  Facial recognition systems are used to attempt to identify an individual by
     using an image of their face.

21.  As described below, facial recognition algorithms consistently misidentify
     Black people at far higher rates than white people.

7

22.    Facial recognition systems operate by analyzing the structure and details of

faces to generate "faceprints" — i.e., unique digital codes corresponding to

each face — and attempting to match different images of the same face

using those faceprints. Because facial recognition systems function by

discerning detail, misidentifications are particularly likely when the image of

the face sought to be identified — the "probe image" — is not sufficiently

visible and clear.

23.    To operate the technology, a user inputs the probe image into the system in

hopes of finding a match.

24.    Once inputted, the system will create a faceprint by analyzing the probe

image according to an "algorithm" — a set of logical steps, operationalized

through computer code, that the system follows to achieve its task of

identifying the individual.

25.    Once a probe image is fed into the system, the system compares the

faceprint it generates from the probe image to a database of already-

generated faceprints of other images and produces an output. The form of

the output varies from system to system, but potential matches are typically

assigned a likelihood score representing the algorithm's confidence in a

match to the face depicted in the probe image. Because face recognition

systems are inherently probabilistic (meaning they cannot say with certainty

that two different images are or are not a match), they typically display a list of possible matches, organized in order of the algorithm's confidence in a match.

26. In part because of errors in the algorithms and variations in the data they process, and in part because the output will often include several individuals with varying associated probability scores, search results are not to be considered positive identifications. The technology is not designed to assert that the first-returned result, nor any of the returned results, is an actual match.

27. As shown below, using facial recognition systems involves risk of error—error which, in the law enforcement context, has grave consequences for the misidentified individual.

<u>The accuracy of a facial recognition search depends heavily on<br>the quality of the probe image.</u>

28. Facial recognition systems are prone to user error because the user has leeway in selecting which probe image to feed to the system.

29. Inputting low-quality probe images will likely produce inaccurate results, a problem referred to as "garbage in, garbage out."[1]

---

[1] Clare Garvie, Ctr. on Privacy & Tech., *Garbage In, Garbage Out: Face Recognition on Flawed Data* 2 (May 16, 2019), https://www.flawedfacedata.com/.

9

30.     Because facial recognition technology operates by matching details in a probe image to details in database images, it is well established that facial recognition searches are less accurate if the probe image is of low quality.[2]

31.     Four qualities of a probe image are particularly important for an accurate facial recognition search: (1) the lighting, (2) the angle at which the face is captured in the image, (3) the image resolution, and (4) facial obstruction.

32.     Poor lighting in a probe image significantly increases the risk of an inaccurate match.[3]

33.     Similarly, the angle at which the face is captured in the probe image affects the system's performance. The facial recognition system is more likely to produce an accurate match if the person's face is directly facing the camera. A face angled away from the camera undermines the system's accuracy.[4]

---

[2] *E.g.* Li et al., *Face Recognition in Low Quality Images: A Survey*. 1 ACM Comput. Surv. 1 (2019), *available at* https://arxiv.org/pdf/1805.11519.pdf.

[3] *E.g.*, Patrick Grother et al., Nat'l Inst. of Standards & Tech., *Ongoing Face Recognition Vendor Test (FRVT) Part 2: Identification* 7 (Nov. 2018), https://doi.org/10.6028/NIST.IR.8238 ("Poor quality photographs undermine recognition, either because the imaging system is poor (lighting, camera etc.) or because the subject mis-presents to the camera (head orientation, facial expression, occlusion etc.)").

[4] *E.g.*, Hisateru Kato et al., *A Real-Time Angle- and Illumination-Aware Face Recognition System Based on Artificial Neural Network* (Aug. 16, 2012), https://www.hindawi.com/journals/acisc/2012/274617/ ("[A]bout 75% of the authentication failure is due to the fact that angle of orientation of the probe face image is different from the stored image.").

10

34.   Further, the resolution of the probe image is crucial.[5] Put simply, blurry

photos obscure details essential to the accuracy of the facial recognition

search.

35.   Moreover, if facial details are obscured by objects such as hats, masks,

scarves, eye patches, etc., the accuracy of the facial recognition search will

be diminished.[6]

36.   Inputting a low-quality image, such as a grainy photo or a photo where the

individual's face is obstructed, heightens the risk that an innocent individual

will be misidentified as a match.

37.   For example, a 2017 National Institute of Standards and Technology

("NIST") report tested dozens of facial recognition algorithms' accuracy in

different settings. Researchers found that facial recognition algorithms were

far more accurate in well-lit environments where individuals are facing

forward, such as airport boarding gates, than in poorly lit environments

where individuals are facing unpredictable directions, such as sporting

events.

---

[5] Li et al., *supra* note 2; Al-Maadeed et al., *Low-quality Facial Biometric Verification Via Dictionary-based Random Pooling*, 52 Pattern Recognition 238 (2015).

[6] *E.g.* Hazım Kemal Ekenel & Rainer Stiefelhagen, *Why Is Facial Occlusion a Challenging Problem?*, *in* Advances in Biometrics 299 (Massimo Tistarelli & Mark S. Nixon eds., 2009), https://doi.org/10.1007/978-3-642-01793-3_31.

38.    Recognizing this, many facial recognition system providers emphasize the importance of probe image quality to their users. For example, DataWorks, in its solicitation of a contract with the Detroit Police Department ("DPD"), states that probe images may be "unsearchable" without sufficient angle and lighting correction.

<u>Facial recognition algorithms are racially biased.</u>

39.    While careful users can decline to use low-quality probe images, they cannot avoid the fact that facial recognition algorithms misidentify people of color at significantly higher rates than white people.[7]

40.    For many years, researchers have understood that facial recognition systems are racially biased—Black individuals are up to *one hundred* times more likely to be misidentified by facial recognition systems than white men.[8]

41.    This racial bias is embedded into the facial recognition system, in part, because the algorithm is "trained" on racially skewed data—meaning that most algorithms were built by analyzing a data set consisting primarily of

---

[7]  *See* Steve Lohr, *Facial Recognition Is Accurate, if You're a White Guy*, N.Y Times (Feb. 9, 2018), https://www.nytimes.com/2018/02/09/technology/facial-recognition-race-artificial-intelligence.html.

[8]  Nat'l Inst. of Standards & Tech., *NIST Study Evaluates Effects of Race, Age, Sex on Face Recognition Software* (Dec. 19, 2019),

https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software.

white (male) faces.[9] For instance, one prominent training dataset consisted of 83.5% white individuals.[10] Because facial recognition algorithms are trained primarily on white faces, they perform poorly in identifying people of color.

42.   In addition, bias is also introduced because digital cameras often fail to provide the degree of color contrast that the algorithm needs to produce and match faceprints from photos of darker-skinned faces.[11]

43.   A 2017 study by the National Institute of Standards and Technology of 140 face recognition algorithms found that problems with false positives "exist broadly," and that "false positive rates are highest in West and East African and East Asian people, and lowest in Eastern European individuals. This effect is generally large, with a factor of 100 more false positives between countries."[12]

---

[9]  J.G. Cavazos et. al., *Accuracy Comparison Across Face Recognition Algorithms: Where Are We on Measuring Race Bias?*, 3 IEEE Transactions on Biometrics, Behavior, and Identity Science, 1, 101 (2021), https://arxiv.org/pdf/1912.07398.pdf.

[10] Joy Buolamwini & Timnit Gebru, *Gender Shades: Intersectional Accuracy Disparities in Commercial Gender Classification*, 81 Proceedings on Machine Learning Research 77, 79 (2018).

[11] GEORGETOWN LAW CTR. ON PRIVACY & TECH, THE PERPETUAL LINE-UP: UNREGULATED POLICE FACE RECOGNITION IN AMERICA 54 (2016), https://www.perpetuallineup.org/.

[12] PATRICK GROTHER, MEI NGAN & KAYEE HANOAKA, NAT'L INST. STANDARDS & TECH., INTERNAL REP. 8280, FACE RECOGNITION VENDOR TEST (FRVT) PART 3: DEMOGRAPHIC EFFECTS 3 (2019)

44.     Both DPD and the Michigan State Police contract with DataWorks, a

company that provides the shell within which other vendors' facial

recognition algorithms can be run. While the DataWorks program can

interface with any facial recognition algorithm, the company recommends

using either the Rank One Computing algorithm ("ROC") or the NEC

Corporation algorithm ("NEC").

45.     The NIST study found that the two algorithms that ROC submitted for

testing misidentified Black individuals at far higher rates than white

individuals.[13] NEC did not submit its algorithms for testing in the false

match rate section of the NIST study.

46.     Importantly, the NIST study used only high-quality photographs to test these

algorithms' accuracy.[14] Researchers have since found that low-quality

images exacerbate these disparate false-match rates.[15] Law enforcement

---

[13] *See* PATRICK GROTHER, MEI NGAN & KAYEE HANOAKA, NAT'L INST. STANDARDS & TECH., INTERNAL REP. 8280, FACE RECOGNITION VENDOR TEST (FRVT) PART 3: DEMOGRAPHIC EFFECTS – ANNEX 7 184-87 (2019) https://pages.nist.gov/frvt/reports/demographics/annexes/annex_07.pdf; *id.* at ANNEX 17 at 31, 37-38.

[14] PATRICK GROTHER, MEI NGAN & KAYEE HANOAKA, NAT'L INST. STANDARDS & TECH., INTERNAL REP. 8280, FACE RECOGNITION VENDOR TEST (FRVT) PART 3: DEMOGRAPHIC EFFECTS 9 (2019), https://nvlpubs.nist.gov/nistpubs/ir/2019/NIST.IR.8280.pdf (explaining that the study "did not use image data from the Internet nor from video surveillance. This report does not capture demographic differentials that may occur in such photographs.")

practices already disproportionately harm people of color; racially biased

tools like facial recognition systems only compound the problem.

<u>Cities across the country are banning the use of<br>
facial recognition systems in policing.</u>

47.   Due to widespread public scrutiny of the technology and its various flaws,

there has been an increasing awareness that facial recognition systems are

inaccurate and dangerous.

48.   A growing number of jurisdictions have officially recognized the dangers of

facial recognition systems in policing. Since 2019, at least 20 cities in the

United States have banned their police departments from using facial

recognition systems, including San Francisco, Boston, New Orleans,

Minneapolis, and Jackson, Mississippi.[16]

---

[15] J.G. Cavazos et. al., *Accuracy Comparison Across Face Recognition Algorithms: Where Are We on Measuring Race Bias?*, 3 IEEE TRANSACTIONS ON BIOMETRICS, BEHAVIOR, AND IDENTITY SCIENCE, 1, 101 (2021), https://arxiv.org/pdf/1912.07398.pdf (explaining that "as item challenge level increased demographic differences were magnified").

[16] Fight for the Future, *Ban Facial Recognition*, https://www.banfacialrecognition.com/map/ (last accessed Mar. 11, 2021); Kate Conger et al., *San Francisco Bans Facial Recognition Technology* (May 14, 2019), N.Y. TIMES, https://www.nytimes.com/2019/05/14/us/facial-recognition-ban-san-francisco.html; Ally Jarmanning, Boston Lawmakers Vote to Ban Use of Facial Recognition Technology by the City (June 24, 2020), NPR, https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/24/883107627/boston-lawmakers-vote-to-ban-use-of-facial-recognition-technology-by-the-city; Kayode Crown, *Jackson Bans Facial Recognition Tech* (Aug. 20, 2020),

49.    For example, Ricardo Arroyo, the City Councilor who sponsored Boston's

bill banning facial recognition technology, reasoned that the technology "has

an obvious racial bias" and "also has sort of a chilling effect on civil

liberties."[17] Boston's Police Commissioner did not oppose the ban.[18]

## FACTUAL ALLEGATIONS REGARDING MR. WILLIAMS'S FALSE ARREST

### Shinola Incident

50.    On October 2, 2018, an unknown individual entered a Shinola store in

Detroit, Michigan, and stole five watches.

51.    The shoplifter spent exactly two minutes in the store, where he was recorded

on the store's security cameras.

---

https://www.jacksonfreepress.com/news/2020/aug/20/jackson-bans-facial-recognition-tech-new-airport-a/.

[17] Ally Jarmanning, *Boston Bans Use of Facial Recognition Technology. It's the 2nd-Largest City to Do So,* WBUR (June 24, 2020), https://www.wbur.org/news/2020/06/23/boston-facial-recognition-ban.

[18] *Id.*

16

52.  At no point did the security cameras capture clear footage of the shoplifter. The individual's back was turned to the cameras for the vast majority of the two minutes of footage.

53.  Even when the shoplifter was facing the cameras, he was wearing a St. Louis Cardinals baseball hat and often had his head angled downwards. As a result, the cameras never captured a clear picture of his face.

54.  When the individual's face appears in the surveillance footage, it is captured from above and afar and is only partially visible, with details of the face obscured by the hat's brim and shadow.

55.  In addition to the security footage, there was one eyewitness in the store—a Shinola salesperson—who spoke with the shoplifter face-to-face, in a well-lit area of the sales floor, for about twenty-five seconds prior to the theft.

Defendant Bussa's investigation impermissibly relies on facial recognition technology.

56.  Shinola reported the theft to the Wayne State University Police on October 5, 2018.

57.  The Wayne State University Police then produced an initial factual report and obtained Shinola's security camera footage.

58.  On October 6, 2018, the Wayne State University Police transferred the investigation to the Detroit Police Department.

17

59.    For over five months after learning about the Shinola incident, DPD's

       investigation lay stagnant, and it made no attempts to investigate.

60.    It was not until March 8, 2019, that the DPD made its first investigatory

       attempt. Resorting to facial recognition technology as his first method of

       investigation, DPD investigator Lavan Adams decided to use a still image

       from the Shinola surveillance footage to conduct a facial recognition search.

61.    As described above, the Shinola surveillance footage never provided a clear

       image of the shoplifter's face.

62.    The still image used by Mr. Adams was plainly unfit for use in a facial

       recognition search, as would have been evident had Mr. Adams received

       even rudimentary training on the proper use of facial recognition

       technology:



63. As can be seen, the individual's face in the low-resolution image is barely visible, poorly illuminated, oriented away from the camera, and partially obscured by his hat.

64. As Defendant Craig conceded in a June 29, 2020, Board of Police Commissioners meeting, "the image … that was used in facial recognition is blurry."

65. As described in paragraphs 28-38, low-quality probe images that do not reveal facial details are likely to lead to misidentifications.

66. In addition, the individual pictured appears to be Black.

67. As shown in paragraphs 39-46, facial recognition technology is significantly more likely to misidentify Black people than white people.

68. Despite a plethora of reasons suggesting that the still was unfit to be a probe image, Detective Adams decided to use it to conduct a facial recognition search. Detective Adams sent the image with a search request to DPD Crime Analyst Roger Yathe.

69. Upon receiving Detective Adams' request, Officer Yathe forwarded the request to the Michigan State Police.

70. As described in paragraphs 195-206 below, the DPD policy in effect at the time (the January Policy) did not require that DPD rely on facial recognition

searches conducted in-house and provided no instructions whatsoever as to what type of probe images met minimum quality standards.

71.  On March 11, 2019, the Michigan State Police returned the result of the facial recognition search to the DPD. The report, entitled "Investigative Lead Report," identified Mr. Williams as an investigative lead.

72.  The image of Mr. Williams that purportedly matched the probe image was an expired driver's license photo. Mr. Williams has a newer driver's license photo on file with the State of Michigan, but apparently that newer image did *not* present as a likely match for the suspect.

73.  The following statement appeared prominently on the Investigative Lead Report, in the form shown: "**THIS DOCUMENT IS NOT A POSITIVE IDENTIFICATION. IT IS AN INVESTIGATIVE LEAD ONLY AND IS <u>NOT</u> PROBABLE CAUSE TO ARREST. FURTHER INVESTIGATION IS NEEDED TO DEVELOP PROBABLE CAUSE TO ARREST**." The phrase "INVESTIGATIVE LEAD ONLY" was highlighted in red ink.

74.  The Investigative Lead Report contains neither the "score" generated by the facial recognition system representing the level of confidence that Mr. Williams's photo matched the probe image, nor the other possible matches that, upon information and belief, should have been returned by the system.

20

75.    The Detroit Police Department did not attempt to ascertain the "score" generated by the facial recognition search nor request the other possible matches to the probe photo.

<u>Defendant Bussa follows the previously generated facial recognition lead despite the flaws of the prior search.</u>

76.    On May 14, 2019, Defendant Donald Bussa assumed responsibility for investigating the Shinola incident.

77.    By the time Defendant Bussa took control of the Shinola investigation, a new facial recognition policy, described in paragraphs 207-213 (the April Policy), was in effect.

78.    As described in paragraphs 209-213, the new policy acknowledged several probe image factors that affect facial recognition technology's reliability and required peer review.

79.    Defendant Bussa, however, ignored the new policy. Even though the facial recognition search "identifying" Mr. Williams as the shoplifter was generated by a woefully substandard probe image and had never been peer reviewed by DPD officers, as required by the new policy, Defendant Bussa decided to rely on the lead anyway.

<u>Defendant Bussa arranges an identification procedure with a person who neither witnessed the theft nor saw the shoplifter.</u>

80.   As part of his so-called "investigation," Defendant Bussa assembled a six-pack photo array that included Mr. Williams's expired driver's license photo alongside five other individuals' driver's license photos.

81.   Defendant Bussa attempted and failed to conduct a photo array identification with individuals who were present in the Shinola store during the incident.

82.   On June 3, 2019, Defendant Bussa spoke with a Shinola representative who told him that Shinola was not interested in having their employees appear in court.

83.   On June 18, 2019, Defendant Bussa again attempted to conduct a six-pack photo identification procedure with an in-store manager from Shinola, but the store manager refused to participate in the identification procedure.

84.   Defendant Bussa then arranged to conduct a six-pack photo identification with Katherine Johnston. Ms. Johnston, then employed by Mackinac Partners, was contracted by Shinola for loss prevention services.

85.   Defendant Bussa had no legitimate basis whatsoever for asking Ms. Johnston to participate in an identification procedure. Ms. Johnston was not an eyewitness. Ms. Johnston was not in the Shinola store at the time of the incident and has never seen Mr. Williams or the alleged shoplifter in person. Indeed, Ms. Johnston's sole relation to the incident was that she had watched the same low-quality surveillance video that Detective Bussa possessed.

22

86.  As detailed in paragraphs 52-54, the footage is of a low quality and never provides a clear view of the shoplifter's face.

87.  Nevertheless, on July 30, 2019, Defendant Bussa dispatched Detective Steve Posey to meet Ms. Johnston and conduct the identification.

88.  The photo array was not a blind procedure—Posey knew that Mr. Williams was the suspect. Indeed, Posey's sheet was nearly identical to that given to Ms. Johnston, except that Mr. Williams's name was printed in red while all other names were printed in black.

89.  Ms. Johnston identified Mr. Williams's expired license photo as matching the person she had seen in the grainy surveillance footage, and answered the question "Where do you recognize him from?" with "10/2/18 shoplifting at Shinola's Canfield store."

<u>Defendant Bussa produces misleading request for warrant.</u>

90.  With nothing more than the facial recognition system's patently unreliable lead and Ms. Johnston's non-eyewitness "identification," Defendant Bussa concluded his investigation.

91.  On the very same day that Johnston made her "identification," Defendant Bussa wrote out a Request for Warrant ("RFW").

92.  The RFW is what the Detroit Police Department uses as an investigating officer's affidavit in support of a warrant. As an affidavit, the RFW must

23

honestly and accurately represent the state's basis for a warrant to the
magistrate.

93.   Defendant Bussa did not accurately or honestly represent either the facial
recognition match or Ms. Johnston's identification.

94.   Indeed, Defendant Bussa's RFW contained such glaring misrepresentations
and omissions about both pieces of "evidence" that they cannot be the
product of mere negligence alone — they demonstrate deliberateness or
recklessness.

95.   Defendant Bussa's RFW stated that Johnston identified Mr. Williams from a
six-pack photo array without disclosing that Johnston was not an eyewitness.

96.   Consequently, the RFW never revealed the sole basis for Ms. Johnston's
identification: watching low-quality surveillance footage that never clearly
showed the suspect's face.

97.   The RFW also did not mention that Ms. Johnston had never seen Mr.
Williams in person, or that Ms. Johnston is white and Mr. Williams is Black
— two other factors that make misidentification more likely.

98.   The "Investigation" section of the RFW also did not mention that Defendant
Bussa attempted but failed to meet with the actual eyewitnesses before
arranging Ms. Johnston's participation in the identification procedure.

99.  Any reasonable officer should have known that a magistrate considering whether to issue a warrant would need to know that an "identification" upon which the warrant was based was performed by someone who was not in fact an eye-witness to the crime. Defendant Bussa's RFW described the facial recognition lead in a similarly dishonest manner, omitting key details that go to the evidence's reliability.

100. As described below, in paragraphs 207-213, at the time Defendant Bussa wrote the RFW, he received, had knowledge of, or had access to DPD's April Policy governing facial recognition as well as news articles and technical literature informing him of the factors that affect probe image quality: image resolution, lighting, face orientation, obstruction, and the race of the individual in the probe image.

101. However, in the RFW, Defendant Bussa reported simply that "Video and stills were sent to Crime Intel for facial recognition. Facial recognition came back with a hit for suspect Robert Julian-Borchak Williams." Defendant Bussa failed to disclose that the probe image used to generate that lead was a blurry, dark image that showed an obstructed, barely visible face turned away from the camera. He also did not mention that facial recognition technology is known to be less reliable under all of these circumstances. Nor did he disclose that the image of Mr. Williams that "matched" was

25

actually his expired driver's license rather than the most current image of him on file with the State.

102. Moreover, Defendant Bussa did not disclose that facial recognition technology is substantially less accurate when identifying Black people, and that the person in the probe image is Black.

103. Defendant Bussa further did not disclose the "score" that would have signified the facial recognition system's confidence that the probe image and Mr. Williams's expired license photo depicted the same person.

104. Moreover, despite the Investigative Lead Report's emphasis that the facial recognition lead "IS NOT A POSITIVE IDENTIFICATION" and is merely "AN INVESTIGATIVE LEAD ONLY," and despite DPD policy's emphasis that facial recognition results are "NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION" (capitalization in original), Defendant Bussa presented the facial recognition result as a "hit" — expressing an unjustifiable and factually inaccurate confidence in the search results.

105. On July 31, 2019, Defendant Bussa submitted the RFW to the Wayne County Prosecutor's Office.

106. Defendant Bussa did not submit the surveillance video, probe image, or six-pack photo array to the Wayne County Prosecutor's Office.

107. On August 24, 2019, the Wayne County Prosecutor's Office authorized Defendant Bussa to seek a warrant to arrest Mr. Williams for retail fraud in the first degree (Mich. Comp. Laws § 750.356c).

108. Defendant Bussa's RFW was presented to a magistrate on August 25, 2019.

109. Defendant Bussa did not submit the surveillance video, probe image, or six-pack photo array to the magistrate.

110. Because Defendant Bussa described the minimal "evidence" he possessed with material misrepresentations and omissions, and because he failed to disclose numerous exculpatory facts that were known to him at the time of the request, the magistrate authorized the issuance of an arrest warrant for Mr. Williams.

<u>Plaintiff Robert Williams</u>

111. Robert Williams is a 43-year-old father who was born in Detroit's west side and is a graduate of Cooley High School. He has never been convicted of a crime.

112. Mr. Williams is a proud dad of two daughters, J.W. and R.W., ages 7 and 3. Above all, Mr. Williams cherishes being a good father and role model to his daughters.

113. Mr. Williams, his daughters, and his wife of 11 years, Melissa Williams, live in a residential neighborhood in Farmington Hills.

27

114. Mr. Williams is a logistics planner in the automotive industry and has worked at his current company for eight years.

115. When Mr. Williams is not working, he enjoys playing with his daughters, grilling food for his family and neighbors, and playing basketball.

116. While Mr. Williams owns a few watches, none of them are from Shinola.

117. In fact, the only time that Mr. Williams has ever stepped foot inside a Shinola store was more than six years ago, in June of 2014, when he went to peruse the store with his wife and infant daughter for his brother-in-law's birthday.

<u>Wrongful Arrest</u>

118. On January 9, 2020, Detroit Police Department officers drove to Robert Williams's home to arrest him for a crime that he did not commit.  This happened over three months after the warrant was issued for his arrest, and over two months after DPD updated its facial recognition policy again, as described in paragraphs 214-218 (the September Policy), to prohibit the use of facial recognition technology in cases involving theft offenses.

119. Before showing up at the Williams family home, DPD officers called Melissa Williams on the phone, masquerading as Farmington Hills police, and demanding that she get her husband to come to the police station.

120.    The officers were demeaning towards Ms. Williams, aggressively

demanding that she persuade Mr. Williams to comply with their demands

because she was, in the officers' words, his "baby mama."

121.    Ms. Williams was confused as to the officers' demands; she did not

understand what possible reason existed for the police to make such

demands. The officers refused to tell Ms. Williams why they wanted Mr.

Williams to come to the police station. The conversation was so absurd that

Ms. Williams believed it was a prank call.

122.    The officers next called Mr. Williams, who was at work when he received

the call.

123.    The officers were again demeaning and aggressive. When Mr. Williams

explained that he was at work, the officers threatened to come to his

workplace and "cause a scene." Mr. Williams responded that he was leaving

work soon. This may be the only thing that prevented Mr. Williams from

being arrested in front of his bosses and co-workers—and quite possibly

being fired as a result.

124.    Mr. Williams asked why the officers wanted him to come to the police

station. They refused to explain what crime they were accusing him of,

stating only that it was for a "serious matter."

125.  Mr. Williams, believing like his wife that the call must have been a prank, ended the conversation and went about his day at work.

126.  As captured on police vehicle and body-camera footage, at 3:12 p.m., DPD officers drove to Mr. Williams's Farmington Hills neighborhood in a marked police car.

127.  Two minutes later, an officer knocked on the Williamses' front door, holding a package and impersonating a delivery worker. The officers received no answer because no one was home. At one point, one of the officers walked around the side of Mr. Williams's house, and peered in their back yard.

128.  For the next two hours, officers surveilled the Williams family home in a marked police car, in plain view of their neighbors.

129.  Hours after DPD officers first arrived, Ms. Williams returned to her home.

130.  Officers then knocked on the front door again. Ms. Williams answered. This was when, to her surprise, she realized that the earlier call from DPD officers was not a prank.

131.  Ms. Williams still did not know, however, why the police officers were at her door looking for her husband. In fact, the officers never even identified themselves as police officers from Detroit; Ms. Williams had to learn that information on her own from the officers' uniforms and marked police car.

30

And as noted earlier, when they had first called her, the officers

misrepresented themselves as Farmington Hills officers.

132.   The Williams's eldest daughter, five-year-old J.W., stood at the door with

her mother as the officers stated that they were there to arrest her father.

133.   Meanwhile, Mr. Williams left work and called his wife to ask what she and

the daughters wanted for dinner. Ms. Williams let her husband know that

police officers were at their home.

134.   At approximately 5:22 p.m., Mr. Williams returned home from work and

parked in his driveway.

135.   Seconds later, DPD officers pulled their marked car diagonally behind his,

jumped out of the vehicle, and arrested him.

136.   Both his five-year-old daughter and two-year-old daughter stood in the

driveway, watching horrified as police officers handcuffed their father and

put him into the police car.

137.   Throughout the arrest, both Mr. and Ms. Williams tried to get more

information from the officers about why he was being detained. It was only

when Mr. Williams demanded to see a warrant that he learned anything at all

about the basis for his arrest.

138.   Seeing the warrant was the first time he learned what he was being accused

of—felony larceny. Bewildered, both Mr. and Ms. Williams tried to think of

31

what theft in Detroit could possibly be attributed to Mr. Williams. Given that they rarely shopped in Detroit, this provoked more questions than answers.

139.   When Ms. Williams asked where her husband was being taken, the officers told her they were taking him to the Detroit Detention Center. When she asked for a card or some contact information, the officers told her to "Google it."

140.   Like his wife, Mr. Williams was given no information about why he was being taken into custody. Even as he was placed into the police car, Mr. Williams thought the officers were taking him to the station for some questioning, perhaps to ask Mr. Williams for an alibi for whatever incident the officers were investigating.

141.   The officers did not take Mr. Williams to a police station. They never asked him whether he had an alibi. Instead, the officers took Mr. Williams straight to the Detroit Detention Center.

142.   As Mr. Williams was torn away from his family in handcuffs, he told his five-year-old daughter that he would see her soon. It was the last thing Mr. Williams said before being taken away by DPD officers and incarcerated in a dank concrete cell for approximately 30 hours.

<u>Wrongful Imprisonment</u>

32

143. Mr. Williams's arresting officers took him to the Detroit Detention Center without ever telling him why he was arrested. When he asked what he was accused of stealing, they refused to explain anything to him.

144. Jail staff processed Mr. Williams by taking his fingerprints, confiscating his possessions, and even taking his shoelaces. All the while, he tried learning why he was arrested, but no staff member told him anything. A staff member did tell him that his fingerprints may be able to reveal that he had done nothing wrong.

145. As the processing staff took Mr. Williams's belongings, he told them that he was diabetic and needed to keep his insulin syringe to control his blood sugar level. The processing staff told him that that was not possible, and that a nurse would be available should he need it.

146. Mr. Williams was led to a cell with roughly a dozen other men. The cell was filthy — its trash can was overflowing, its water fountain was corroded and had trash strewn on its top, and the smell of bodily fluids was pungent.

147. Trying to pass the time, he began speaking with a cellmate, who told him that he overheard the arresting officers, who had not provided any information to Mr. Williams, telling the corrections officers that he was arrested for stealing watches. Mr. Williams was not sure if he could believe

that, as his arresting officers consistently refused to give him any information about why he had been arrested.

148. Mr. Williams was extremely hungry because he was arrested before he could eat dinner with his family. But he was not offered dinner because he was brought to the detention center after dinner had been served. He waited in anticipation for his fingerprints to exonerate him, as the processing staff led him to believe was possible.

149. At roughly 1:00 a.m., when Mr. Williams heard corrections officers calling his name, he became hopeful that he would soon be released.

150. But instead of releasing him, the corrections officers had come to take a sample of his DNA and record his palm prints.

151. During that time, Mr. Williams asked the corrections officers why he was in police custody. The corrections officers were nonresponsive.

152. Before being led back to the cell, Mr. Williams asked the officers if he could have a drink of water, something he had not had since he arrived because of how disgusting the water fountain in the cell was. The officers told him he could use his hands to drink out of a sink, but given that Mr. Williams's hands were covered in ink after having his palm print taken, that was not a viable option. Mr. Williams then returned to the cell despondent, hungry, and thirsty.

34

153.    When Mr. Williams returned to the cell, he realized that there were fewer
        bed mats provided than there were people and that he didn't have a bed mat.

154.    So, unable to lie on a bed mat, he laid his six-foot-one frame on a concrete
        slab that was too short for his body, and tried to go to sleep.

155.    Mr. Williams has back problems, and lying on the concrete aggravated his
        back pain.

156.    Mr. Williams did not get sleep that night. Throughout the night, Mr.
        Williams thought about how he did not fulfill his promise to his daughter to
        be home soon. He wished he could be with his wife. He worried about his
        job, given that his absence at work the following day would be unexplained.

157.    The following morning, Mr. Williams was brought to another room in the
        Detroit Detention Center where he was to be arraigned by video. He would
        not be allowed to see a judge in person. A lawyer who was appointed to
        assist him with his arraignment spoke to Mr. Williams for a few minutes
        before this arraignment, but the lawyer did not know what Mr. Williams was
        being charged with stealing either.

158.    When Mr. Williams made his appearance before the judge, he pled not
        guilty.

159.    After entering his not-guilty plea, two investigators summoned him to an
        interrogation room.

35

160.  The officers had Mr. Williams read his *Miranda* rights and instructed him to sign a waiver if he agreed to make a statement.

161.  Mr. Williams expressed his confusion about his Kafkaesque situation to the officers — how was he to make a statement when he did not know why he was in police custody in the first place?

162.  An officer replied by telling Mr. Williams that he would explain the reason for his arrest, but only if he would first agree to make a statement.

163.  Just to find out why he was in jail, Mr. Williams agreed to speak, and therefore signed a waiver of his right to remain silent.

164.  Mr. Williams learned that the officers were not there to explain the circumstances leading to his arrest, but instead to ask about other shoplifting incidents.

165.  The officers asked if Mr. Williams had ever been to the John Varvatos store in Detroit. Mr. Williams told them that he had never been to that store.

166.  Despite not being the investigators on the Shinola case, the officers nonetheless also asked Mr. Williams when he had last been to a Shinola store. Mr. Williams told the officers that he recalled being there once, in 2014, on his brother-in-law's birthday.

167.  In response, one of the officers showed Mr. Williams a sheet of paper with an enlarged still of the Shinola surveillance footage on it. The officer then

36

asked Mr. Williams if he wanted to tell the truth and tell them when he had last been to the Shinola store.

168.   Amazed, Mr. Williams held up the paper to his face and said something to the effect of, "Does this look like me? I hope you do not think all Black people look alike."

169.   At that point, the officers turned over the facial recognition lead sheet, which showed the surveillance footage still and Mr. Williams's expired driver's license photo. Mr. Williams then pointed out that the facial recognition report that "matched" his face stated that it was an "investigative lead only" and did not constitute probable cause to arrest.

170.   The officers seemed surprised, and after seeing Mr. Williams in person, the officers realized that he was not the person in the image. One of the officers said something like, "Oh, I guess the computer got it wrong."

171.   Despite their acknowledgement of his wrongful arrest, the officers said they did not have the authority to release Mr. Williams.

172.   Mr. Williams then returned to the holding cell, where he was kept with roughly forty other men. Mr. Williams sensed tension brewing in the room, which led him to wonder what he would do if someone tried to physically assault him.

173.  Mr. Williams, increasingly sad and nervous, called his wife. He told her that
      the officers realized he wasn't the person they were looking for, but could
      not promise him that he'd be released that day. He told her that if he was not
      released that day, he would likely spend the weekend, which included his
      birthday, in jail for a crime that he did not commit.

174.  Finally, after approximately eight more hours, Mr. Williams was released
      subject to a personal bond.

175.  The Detroit Detention Center does not allow those released from custody to
      wait indoors. So, Mr. Williams had to wait outside on a rainy January night
      as his wife arranged child care for their daughters and then drove from their
      home, roughly thirty minutes away.

176.  Finally, his wife arrived. Mr. Williams's thirty hours as a prisoner was over.

<u>Consequences of Wrongful Arrest and Incarceration</u>

177.  As Mr. Williams sat in the passenger seat of his car heading home, he was
      relieved but realized that his ordeal was far from over.

178.  Mr. Williams thought first about his daughters. He knew that they had
      watched their father arrested, and he was worried about their well-being.

179.  He also recognized that he was still facing charges for retail fraud, and given
      the fact that he had already been falsely arrested for the crime, he was not
      confident that he would be acquitted.

38

180. Mr. Williams also worried that he would face professional repercussions because of his arrest, and wondered about how he would explain what happened to his employer.

181. Given the fact that he was arrested in plain view of his neighbors, Mr. Williams also worried about how his neighborhood would treat him and his family.

182. When Mr. Williams came home, he immediately noticed changes.

183. Prior to his arrest, the family displayed in their living room a canvas portrait of the family. Mr. Williams noticed that the portrait had been turned around. When he asked his wife why the portrait was flipped over, he discovered that J.W. had flipped it around because she and her sister cried every time they saw it.

184. For weeks after Mr. Williams returned home, J.W. and R.W. cried around their father, and J.W. asked him when the police would come and take him away again. They also began playing cops-and-robbers type games, in which his daughters told Mr. Williams that he was the robber because he stole something.

185. Mr. Williams returned home the day before his birthday. He spent his birthday despondent, trying to figure out a way to create a sense of normalcy for himself and his daughters.

39

186.    Alongside trying to calm his daughters, Mr. Williams had to worry about
        hiring counsel.

187.    The first few lawyers that Mr. Williams approached did not seem interested
        in his case, but told him that they would represent him in exchange for a
        hefty fee. Not having a trusted lawyer while life-altering charges hung over
        his head left him extremely nervous.

188.    While charges were pending, Mr. Williams's employment status hung in the
        air. Though he continued to attend work when he wasn't looking for
        lawyers, Mr. Williams was certain that he'd lose his job if he was convicted,
        and was not sure what would happen to his job status if he were put on
        probation or pled to a lesser offense.

189.    Fortunately, Mr. Williams eventually secured legal representation, and
        attorney Victoria Burton-Harris represented Mr. Williams at his probable
        cause conference on January 23. At that conference, the Wayne County
        Prosecutor's Office dismissed all charges against Mr. Williams. However,
        they did so without prejudice, reserving the right to refile charges against
        him. No one apologized to Mr. Williams or explained that his case was
        being dismissed because he had been wrongfully identified by a computer
        (and shoddy detective work) as the suspect.

190. Mr. Williams and his family still feel the lasting effects of the wrongful arrest.

191. To this day, both of his daughters are still shaken to tears whenever they think of what happened to their father. Both Mr. Williams and his wife take pains to avoid exposing their daughters to things that remind them of the wrongful arrest, such as police. Nonetheless, watching their father be arrested on their front lawn was the children's first encounter with the police. The Williams family understandably worry how this will impact their daughters' attitudes and development as they grow up.

192. Neighbors have inquired about the incident, which has brought Mr. Williams embarrassment.

193. Of course, Mr. Williams also remains distressed by what happened. Not only is he continuously pained by the indignity of being arrested, he worries about being wrongfully arrested again. He is confident that, should facial recognition continue to be used without adequate oversight, training, and standards, wrongful arrests will continue to happen. And he is deeply fearful that he will again be wrongfully arrested as a result, especially since his photos remain in the police matching database that led to his wrongful arrest and because the DPD uses the same facial recognition technology as the MSP that falsely identified him.

41

194.   Mr. Williams is also deeply aggrieved by the fact that DPD chose to use, and continues to use, technology that is more likely to misidentify him because of his race. He does not believe that he should have to live with a greater fear of arrest and thus experience less benefit from police services because of his race, and is distressed that DPD uses demonstrably racially biased technology. This has and will continue to impact Mr. Williams family life because his daughters now associate the police with their father's false arrest rather than as a source of protection.

## FACTUAL ALLEGATIONS REGARDING DPD'S EVER-CHANGING FACIAL RECOGNITION POLICY

DPD's original facial recognition policy ("the January policy") had no quality control provisions whatsoever and did not provide adequate training.

195.   From January 11, 2019, to March 31, 2019, DPD's use of facial recognition technology was governed by Manual Directive 307.5 ("January policy").

196.   The January policy was in effect when Detective Adams submitted a probe image for use in a facial recognition search, as described in paragraph 68.

197.   The January policy did not require or provide any training whatsoever for DPD officers on how to properly select and submit probe images for facial recognition searches.

198.   Moreover, the policy did not contain any quality control standards to ensure that probe images are acceptable for facial recognition analysis.

42

199. Consequently, the January policy did not put officers submitting probe images on notice to those factors, described in paragraphs 28-46, that make facial recognition misidentifications more likely.

200. Under the January policy, an investigator desiring a facial recognition analysis must complete a written request and deliver it to the commanding officer of Crime Intelligence. Once a request is received and processed, section 307.5 - 6(3) directs the DPD agent receiving the request to complete a report for the requestor "if the facial recognition system detects a viable candidate." The policy does not define "viable candidate" or explain how the facial recognition system would detect such a candidate.

201. The January policy does not require review by a second officer or supervisor before disseminating the results of the facial recognition search.

202. The January policy provides no guidance for officers who receive the facial recognition lead. As described above, the January policy does not require that those submitting probe images for facial recognition searches be trained, so officers were unable to accurately gauge the reliability of facial recognition leads.

203. The January policy does not supplement officers' lack of training by requiring those receiving the lead to corroborate the lead in any way.

204. Nor does the policy require officers to disclose information bearing on the facial recognition lead's reliability to magistrates when requesting a warrant.

205. Moreover, the January policy only regulates DPD's in-house use of facial recognition technology. In other words, the policy does not govern or consider the possibility of DPD's own officers requesting facial recognition searches from an outside agency.

206. Therefore, officers who received no training in facial recognition technology were permitted to bypass the January policy entirely by submitting facial recognition requests to an outside agency.

<u>DPD implements a revised facial recognition technology policy ("the April policy").</u>

207. On April 1, 2019, under public pressure resulting from the disclosure of its previously unregulated use of facial recognition technology, the DPD's Crime Intelligence Unit ("CIU") instituted a new policy governing the use of facial recognition technology in Section 8 of the DPD CIU's Standard Operating Procedure ("April policy").

208. As described in paragraph 76-77, when Defendant Bussa assumed responsibility for the Shinola investigation, the April policy was in effect.

209. Section 8.7(b) introduced quality control standards, requiring CIU examiners to "analyze, review, and evaluate the quality and suitability of probe images, to include factors such as the angle of the face image, level of detail,

44

illumination, size of the face image, and other factors affecting a probe image prior to performing a face recognition search."

210. Further, section 8.5(d)(vi) required that possible facial recognition leads be reviewed by a second "authorized, trained examiner" before disseminating results to the requester.

211. However, the policy does not require retroactive review of facial recognition leads produced under its previous policy, described above. This, despite the fact that Section 8.7(c) of the April policy recognized that "the integrity of information depends on quality control and correction of recognized errors which is key to mitigating the potential risk of misidentification or inclusion of individuals in a possible identification."

212. Section 8.5(d)(viii)(g) of the updated policy also provides the important disclaimer that "the result of a facial recognition search provided by the Detroit Police Department is only an investigative lead and is NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT." (Capitalization in original).

213. Thus, the April policy put investigators, including Defendant Bussa, on notice of the importance of probe image quality, the necessity of peer review, and the fact that a facial recognition lead was not to be considered a

positive identification—including for facial recognition leads produced prior to the updated policy.

Detroit institutes new policy ("the September policy") before Mr. Williams's arrest.

214.   On September 19, 2019, less than a month after the warrant issued for Mr. Williams's arrest, DPD updated Manual Directive 307.5 ("September policy").

215.   Section 307.5 - 5.2 of the policy strictly limited facial recognition use to active or ongoing violent crime or home invasion investigations.

216.   Unlike the January and April policies, the September policy expressly regulates facial recognition requests that DPD officers send to external agencies. Before sending a facial recognition request to the Michigan State Police, section 307.5 - 5.4(2) requires the officer to have their request approved by a CIU supervisor.

217.   The September policy also introduces more robust peer review measures. Section 307.5 - 5.4(3) demands that investigative leads receive two levels of peer review before the lead is disseminated.

218.   However, the September policy did not provide for any retroactive review of ongoing investigations or any active warrants issued in cases that used facial recognition technology under earlier policies.

<u>City of Detroit concedes fault, candidly discusses its failings.</u>

219. At a June 29, 2020, Detroit Board of Police Commissioners meeting, DPD

and City of Detroit employees were given latitude to speak freely about Mr.

Williams's wrongful arrest. At the meeting, Lawrence Garcia, the City of

Detroit Corporation Counsel, stated that "this is an exceptional case. I'm not

a cop, but of course Chief Craig is, and he said this is not a defensible case,

so we would be conceding liability. And there's no harm in speaking frankly

about the facts of this case."

220. Addressing the board, officials admitted error at every step of the Shinola

investigation.

221. Chief Craig acknowledged how unreliable facial recognition technology is.

He stated that "if you just rely solely on facial recognition technology,

there's a high probability that it's going to misidentify."

222. Both Chief Craig and then-Assistant Chief White, who oversaw DPD policy,

spent time addressing the weaknesses in the DPD's earlier January and April

policies that had led to Mr. Williams's wrongful arrest.

223. Chief Craig stated that if DPD had adopted its September policy earlier, "I

am convinced [the wrongful arrest] would not have happened." Assistant

Chief White echoed these thoughts, stating that "if the current policy . . .

would have been in place, this incident would not have happened."

224. Chief Craig conceded that the probe image was inappropriate for facial recognition use. He admitted that the photograph was "blurry," and expressed his belief that "under [the September policy], a blurry image would not be used in facial recognition."

225. Assistant Chief White concurred with Chief Craig, and used his time to focus on other weaknesses in the January and April policies. He addressed the fact that the earlier policies did not explicitly require further investigation after a facial recognition lead, and that the January policy did not require peer review.

226. DPD officials also used their time at the meeting to assess how Defendant Bussa handled the investigation.

227. Chief Craig said "this was clearly sloppy, sloppy investigative work. There's no other way for me to say it but that way."

228. Turning specifically to Defendant Bussa's request for warrant, Chief Craig explained that "what was left out [of the warrant is] the person that made the pick in the photo array was not a direct witness. In fact, the security staff member wasn't even there when the theft took place . . . And we know there's another case emerging out of the same precinct with the same detective [Defendant Bussa]. And so that's causing us deep concern."

229. DPD Detective Graveline also admitted that Defendant Bussa was far from forthright regarding his evidence. Detective Graveline explained that Defendant Bussa arranged a photographic lineup with a "security officer [who] was not present, and was actually picking off of the security video. And [] that fact was not included as part of the investigator's report submitted to the Wayne County Prosecutor's Office."

230. Speaking further about what Defendant Bussa submitted to the Wayne County Prosecutor's Office and the magistrate, Detective Gravelin stated that "it does not include many details other than a theft occurred at Shinola, what was taken from Shinola, that there was video, and that a person from the security firm had picked out Mr. Williams as the perpetrator. It did not mention that it was not an in-person pick or any of that information."

231. In short, Mr. Williams's wrongful arrest resulted from a combination of what DPD officers acknowledged was "sloppy, sloppy investigative work," a "blurry" photograph, DPD policies that did not regulate probe image quality, demand peer review, or further investigative work, and Defendant Bussa's RFW which misrepresented evidence and omitted mention of key details.

<u>The Williams arrest is part of a troubling pattern in which Defendants have abused facial recognition technology.</u>

49

232. Unfortunately, what happened to Mr. Williams was no isolated incident.

233. On May 15, 2019, Defendant Bussa was assigned to investigate a reported assault and larceny.

234. The victim recorded a video of the incident on his cellphone, and turned that video over to Defendant Bussa.

235. Defendant Bussa then captured a still image from the video, showing the alleged perpetrator's face, and sent it in to the Detroit Police Department's Crime Intelligence Unit.

236. The facial recognition search returned Michael Oliver as an investigative lead.

237. The investigative lead report does not include the "score" indicating how confident the system is that Mr. Oliver is the person pictured in the probe image, but does contain the disclaimer signifying that a result from a facial recognition search "is only an investigative lead and is NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT." (capitalization in original).

238. In reality, Michael Oliver was not the person pictured in the probe image.

239. But the facial recognition system suggested the wrong person in part because the individual in the probe image is Black, and the technology has proven to misidentify Black people at far higher rates than white people.

50

240. Defendant Bussa then compiled a six-pack photo array that included Mr. Oliver's picture.

241. As was the case in the Shinola investigation, Defendant Bussa dispatched Detective Posey to conduct a six-pack photo array identification.

242. And, similarly, the identification procedure wasn't conducted blindly — Posey knew that Mr. Oliver was the person of interest.

243. Again, the person sitting across from Detective Posey picked the same individual that the facial recognition system had identified as an investigative lead.

244. Defendant Bussa then wrote out a RFW to present to the Wayne County Prosecutor's Office and magistrate judge.

245. Like the RFW that Defendant Bussa produced for Mr. Williams, the RFW does not disclose any information about the quality of the probe image, the "score" associated with the facial recognition system's search, that facial recognition systems are prone to misidentifying Black people, and that facial recognition results are not to be considered positive identifications per departmental policy. Nor did the RFW disclose to the magistrate that Mr. Oliver's arms are covered in numerous tattoos—and that the cell phone video clearly showed that the person who grabbed the cellphone did *not* have any such tattoos.

51

246.  After reviewing the RFW, a magistrate issued an arrest warrant for Mr. Oliver.

247.  On July 31, 2019, the very day Defendant Bussa wrote out his RFW to arrest Mr. Williams, Mr. Oliver was arrested while driving to work.

248.  Mr. Oliver spent three days in police custody.

249.  Two weeks later, a prosecutor dismissed charges against Mr. Oliver after recognizing that Mr. Oliver is not the person pictured in the probe image.

## CAUSES OF ACTION

250.  Plaintiff incorporates the above allegations as if fully set forth herein.

### Count I
### False Arrest and Imprisonment in Violation of the Fourth Amendment and 42 U.S.C. § 1983
(Defendant Bussa)

251.  The Fourth Amendment to the United States Constitution guarantees the right of the people "to be secure in their persons … against unreasonable … seizures" and demands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."

252.  In providing that warrants may issue only upon probable cause, the Fourth Amendment requires that the investigating officer will present their evidence in good faith. Consequently, the law clearly recognizes that an officer who

obtains a warrant under false pretenses violates the constitutional rights of the individual against whom that warrant issues.

253.    Applying clearly established law, a reasonable officer in Defendant Bussa's position would have known that they did not have probable cause to seek a warrant to arrest Mr. Williams.

254.    Indeed, Defendant Bussa obtained an arrest warrant only because he knowingly or recklessly misrepresented both the nature of Katherine Johnston's identification and the reliability of the facial recognition result.

255.    Because Defendant Bussa knowingly and recklessly misrepresented and omitted key facts about his evidence, a magistrate authorized a warrant to arrest Mr. Williams.

256.    By failing to disclose obviously exculpatory information that was known to him at the time of the warrant request to procure an arrest warrant where no probable cause existed, Defendant Bussa invaded the liberty guaranteed to Mr. Williams by the Fourth Amendment.

**Count II**
*Monell* Liability for False Arrest and Imprisonment in Violation of the Fourth Amendment and 42 U.S.C. § 1983
(Defendants City of Detroit and Chief Craig in His Official Capacity)

257.    Mr. Williams was injured and had his Fourth Amendment right to be free of unreasonable seizures violated because DPD established inadequate policies,

failed to train officers, and exhibited a custom of acquiescence regarding deficient facial recognition practices.

258. The January policy, which governed DPD during the facial recognition search that led to Mr. Williams's false arrest, left a bevy of factors unregulated. Once requests for facial recognition searches were received, the January policy allowed searches without regard for the probe image quality. Once a search produced results, the January policy did not demand that the lead be reviewed by peers or supervisors, or further corroborated in any way. Moreover, the January policy did not regulate facial recognition requests being sent to external agencies.

259. The flaws and weaknesses of facial recognition technology were both knowable and known at the time that the DPD developed and implemented its January policy.

260. Given the publicly known flaws of facial recognition technology, combined with Chief Craig's admission that facial recognition technologies are prone to misidentifying individuals, Defendants Chief Craig and the City of Detroit caused Robert Williams's injuries and violated his Fourth Amendment rights by failing to guard against foreseeable errors and their consequences.

261. The DPD's April policy regarding facial recognition made some improvements, but did not require officers to re-examine any searches

54

conducted prior to April 2019, creating an intolerable risk that searches

conducted prior to the April policy would result in a false arrest.

262.   Similarly, the DPD's September policy regarding facial recognition made

additional improvements, but did not require officers to comply with the

policy for searches conducted prior to September 2019, creating an

intolerable risk that searches conducted prior to the September policy would

result in a false arrest.

263.   Moreover, DPD did not adequately train its officers, including Detective

Bussa, to properly utilize facial recognition technology at any point

described herein.

264.   DPD knew and was in possession of information notifying them of the

importance of probe image quality for generating reliable leads. Defendant

Craig possessed information that facial recognition technology will not work

as intended if certain factors are met. However, the City of Detroit and DPD

did not adequately train officers to ensure that foreseeable errors were

avoided.

265.   The probe image used is inarguably deficient for use in facial recognition

technology. At least four DPD officials – Defendant Bussa, Adams, Yathe,

and Posey – saw the probe image used and decided to rely on it. Because the

City of Detroit and DPD knowingly permitted use of facial recognition

technology without adequately training those who would use or rely on facial recognition technology, the low-quality probe image was sent to the Michigan State Police, and was subsequently heavily relied on, leading to Mr. Williams's false arrest.

266.   Given the weight DPD placed on facial recognition searches, as both Mr. Williams's and Mr. Oliver's cases evidence, the failure to regulate the use of facial recognition technology or train its employees about the technology amounts to deliberate indifference to the plight of those who would be erroneously "identified" and included in six-pack photo lineups, where there would be significant chance that they'd be identified once more, particularly given that their inclusion in such a lineup is likely to look *something* like the suspect precisely because of having been identified as a potential match by the facial recognition technology.

267.   On September 13, 2019, the Wayne County Prosecutor's Office dropped charges against Mr. Oliver, putting DPD on notice of gaps in its earlier policies and training programs.

268.   Six days later, DPD promulgated the September policy which provided for no retroactive review of facial recognition use under earlier policies. The lack of retroactive review, despite the notice of the unlawful effects of

earlier policies and practices, amounts to tacit approval of facial recognition use under the earlier policies.

**Count III**
Mich. Comp. Laws § 37.2302: Violation of the Elliott-Larsen Civil Rights Act
(Defendant Chief Craig in His Official Capacity and Defendant Bussa)

269.   The Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302, states that, "except where permitted by law, a person shall not (a) [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."

270.   The Detroit Police Department is a public service within the meaning of the statute. Mich. Comp. Laws § 37.2301 defines "public service" to be "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof."

271.   By employing technology that is empirically proven to misidentify Black people at rates far higher than other groups of people, the DPD denied Mr.

Williams the full and equal enjoyment of the Detroit Police Department's

services, privileges, and advantages because of his race or color.

**Count IV**
<u>False Arrest and Imprisonment in Violation of the Michigan Constitution and
Michigan Common Law</u>
(Defendant Bussa)

272.   The Michigan Constitution, like the Constitution of the United States,

demands that there be probable cause to arrest individuals. There was no

probable cause that Mr. Williams committed a crime.

273.   As detailed in Count I, Defendant Bussa knowingly or recklessly

misrepresented and omitted information in the affidavit that was material to

the magistrate's decision to issue an arrest warrant.

274.   Defendant Bussa's false statements and omissions led to Mr. Williams's

wrongful arrest and imprisonment, and so Defendant Bussa committed the

Michigan state law tort of false arrest and imprisonment.

**RELIEF REQUESTED**

275.    Wherefore, Plaintiff prays for:

a.   Damages as may be proven at trial to compensate Plaintiff for all pain, suffering, humiliation, shame, embarrassment, and emotional distress caused by being falsely arrested and imprisoned.

b.   Damages as may be proven at trial to compensate Plaintiff for lost wages caused by the unlawful arrest and imprisonment.

c.   All punitive and exemplary damages as may be proven at trial.

d.   Interest on all sums awarded to Plaintiff from the date of the events and/or losses.

e.   An award of Plaintiff's reasonable attorney's fees and costs of this action, pursuant to 42 U.S.C § 1988 and any other applicable law.

f.   A declaratory judgment and injunction requiring that officers using facial recognition technology must disclose to the magistrate:

   i.   the probe image used when the presence of a "match" or "hit" is disclosed to the magistrate;

   ii.   that facial recognition technology's accuracy depends on the ability to discern facial details, and so depends on the probe image's image quality, lighting, face angle, and face obstructions;

   iii.   that error rates increase as the quality of the probe image decreases;

59

      iv.   the error rates associated with the relevant facial

recognition algorithm, by race and gender;

      v.   that a facial recognition "match" or "hit" is not

considered a positive identification of the suspect.

g.     A declaratory judgment and injunction prohibiting Defendants

from using facial recognition technology as an investigative

technique so long as it misidentifies individuals at materially

different rates depending on race, ethnicity, or skin tone.

h.     An injunction prohibiting Defendants from performing, or causing

any other law enforcement agency to perform on their behalf, any

facial recognition search using any database in which any images

of Mr. Williams are included.

i.     Any further or other relief the Court deems just and proper.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Jeremy Shur*
Deborah Won*
CIVIL RIGHTS LITIGATION INITIATIVE
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
jshur@umich.edu

debwon@umich.edu

* Student Attorney practicing pursuant to
Local Rule 83.21

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

Counsel for Plaintiff

Dated: 04/13/2021


**JURY DEMAND**


Plaintiff requests a trial by jury in this matter.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Jeremy Shur*
Deborah Won*
CIVIL RIGHTS LITIGATION INITIATIVE
University of Michigan Law School

61

701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
jshur@umich.edu
debwon@umich.edu

\* Student Attorney practicing pursuant to
Local Rule 83.21

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

Counsel for Plaintiff

Dated: 04/13/2021