# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ROBERT JULIAN-BORCHAK WILLIAMS,

             Plaintiff,

v.

CITY OF DETROIT, a municipal corporation,
DETROIT POLICE CHIEF JAMES CRAIG, in
his official capacity, and DETECTIVE
DONALD BUSSA, in his individual capacity,

      Defendants.

_____/

Case No. 21-cv-10827

Hon. Laurie J. Michelson

**PLAINTIFF'S RESPONSE
TO DEFENDANTS' FIRST
SET OF
INTERROGATORIES TO
PLAINTIFF**

JURY TRIAL DEMANDED

Michael J. Steinberg (P43085)
Ben Mordechai-Strongin*
Lauren Yu*
William Ellis*
Michael Terlep*
Julia Kahn*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
bmstrong@umich.edu
laurenyu@umich.edu
wwellis@umich.edu
mterlep@umich.edu
jekahn@umich.edu

*Student Attorney practicing pursuant to Local
Rule 83.21

_____/

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
Ramis J. Wadood (P85791)
American Civil Liberties
   Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org
rwadood@aclumich.org

Nathan Freed Wessler
   American Civil Liberties
Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

## <u>PLAINTIFF'S RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFF</u>

Plaintiff's responses to Defendants' First Set of Interrogatories to Plaintiff were prepared in full compliance with the Federal Rules of Civil Procedure and pursuant to a reasonable and duly diligent search for the information properly requested. The responses set forth herein are based upon Plaintiff's knowledge and belief current as of the date below. While discovery is ongoing, Plaintiff may supplement his responses to Defendants' discovery requests in accordance with the Federal Rules of Civil Procedure if additional information is learned that changes or modifies these responses.

1.      Plaintiff provides these responses without waiving or intending to waive:

     a.      all questions as to competency, relevancy, materiality, privilege, or admissibility into evidence in any proceeding or trial of this action;

     b.      the right to object on any ground to any further demand for further responses to the requests; and

     c.      the right to revise, correct, expand, or clarify any of these responses.

2.      Plaintiff objects to Defendants' definitions and instructions as improper and unduly burdensome to the extent that they (1) purport to impose any

2

obligations broader than those set forth in the Federal Rules of Civil Procedure, and (2) purport to define terms or phrases in a manner different from their ordinary common meaning.

3.     Plaintiff objects to Defendants' requests to the extent they seek information protected from discovery by the attorney-client privilege, the work-product doctrine, or any other information that is otherwise privileged or protected from discovery. Plaintiff will not produce privileged documents. Plaintiff will, however, produce a privilege log identifying documents withheld on the basis of a privilege from production, with the exception of documents maintained in attorney working files for which any disclosure, in itself, would infringe the attorney-client privilege and the attorney work-product doctrine.

Subject to and without waiving these objections, Plaintiff responds to the interrogatories as follows:

**INTERROGATORIES:**

1.     Please provide Plaintiff's personal information, including: full name, any former names, present address as well as former addresses for the past 10 years, date of birth, birthplace, social security number, driver's license number along with the issuing state or governmental authority, height and weight, whether Plaintiff wears glasses or hearing aids and whether Plaintiff is left or right hand dominant:

**RESPONSE:** Plaintiff's full name is Robert Julian-Borchak Williams. He has no former names. Plaintiff's addresses over the last 10 years are: (1) █████████████ █████████████████████████████; (2) ██████████████████████████ █████████████. Plaintiff's date of birth is ████████████. Plaintiff's birthplace is ███████████. Plaintiff's social security number is ████████████. Plaintiff's driver's license number is ████████████, and the issuing state is Michigan. Plaintiff's height is 6 feet, 0 inches. Plaintiff's weight is 282 pounds. Plaintiff does not wear glasses. Plaintiff does not use hearing aids. Plaintiff is right-handed.



2.  Regarding each Plaintiff's education, please state the name, business address, and telephone number of each and every school, academic, vocational, or trade, or similar institution Plaintiff has attended, the dates of attendance, the grades or levels successfully completed, the grade point average for each grade or level successfully completed, the type of degrees or certificates received, and whether Plaintiff was ever dismissed, expelled, or otherwise terminated from any of the schools, with an explanation of the underlying circumstances:

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad and not relevant to this litigation to the extent that it asks for information prior to high school.

Plaintiff further objects to this interrogatory as overbroad and not relevant to this litigation to the extent that it asks for grades or grade point averages

Notwithstanding these objections, Plaintiff attended Thomas M. Cooley High School, 15055 Hubbell Avenue, Detroit, Michigan, 48227, from 1992 to 1996, completing ninth through eleventh grade. In 1996, Plaintiff attained his GED from Ruthruff School, 6311 W. Chicago Street, Detroit, Michigan, 48204. Plaintiff was never dismissed, expelled, or otherwise terminated from an educational institution. Even were Defendants' requests for his GPA relevant, Plaintiff has no memory and no record of his high school grades.

3. Regarding Plaintiff's employment or occupational history, including the present time and for the fifteen (15) previous years, please state the name, address and telephone number of each employer and the name of the supervisor(s) at each employment, as well as the corresponding dates of employment, starting and ending salary, along with Plaintiff's job title and a synopsis of Plaintiff's duties, and reason for leaving each employer:

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad, unduly burdensome, and not relevant to this litigation. Notwithstanding these objections, Plaintiff works at Kostal Kontakt Systeme, Inc., 1350 W. Hamlin Road, Rochester,

Michigan, 48309, (248) 284-7600. He worked as a Materials Coordinator from

February 2012 to February 2013, a Supervisor of Logistics/SAP Key User from

February 2013 to October 2017, and a Logistics Planner/SAP Key User from

November 2017 to present day. Plaintiff worked at A123 Systems, 27101 Cabaret

Drive, Novi, Michigan, 48377, (248) 412-9100 (formerly in Livonia, Michigan), as

a Team Leader/Material Handler from April 2011 to February 2012. Plaintiff's

salaries are discussed in Interrogatory 4 below.

 

    **4.**    If each Plaintiff alleges and/or claim loss of past, present, or future

earnings, earning capacity, wages, or employment, or employment

opportunities, as a result of this incident, please state Plaintiff's *gross*

and *net* income and source of income for the three (3) years

immediately <u>before</u> his imprisonment and after his release from prison,

and provide an explanation or method of calculation of the amount of

income you believe was or will be lost, and provide the dates that

Plaintiff was unable to work:

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad and irrelevant to

this litigation to the extent that it asks for income information not needed for

calculating Plaintiff's loss of earnings. Notwithstanding these objections,

Plaintiff's gross salary in 2020 for a twenty-day pay period was ███████, and his

net salary in 2020 for a twenty-day pay period was ▮▮▮▮▮▮. His source of income was his salary as an employee of Kostal Kontakt Systeme, Inc. For Plaintiff's wife's loss of earnings, her gross salary in 2020 for a ten-day pay period was ▮▮▮▮▮ and her net salary in 2020 for a ten-day pay period was ▮▮▮▮▮.

Plaintiff claims a loss of earnings in the amount of ▮▮▮▮▮ for 8 hours on January 10, 2020; ▮▮▮▮▮ for 3 hours on January 14, 2020; ▮▮▮▮▮ for 8 hours on January 21, 2020; and ▮▮▮▮▮ for 8 hours on January 23, 2020. Plaintiff also claims a loss of earnings for his wife in the amount of ▮▮▮▮▮ for 8 hours on January 21, 2020. These figures were calculated based on Plaintiff's salary and his wife's salary.

5.  During the ten (10) years immediately before Plaintiff's imprisonment describe each and every physical injury, disease, defect, illness, limitation, restriction, or any condition requiring medical diagnosis or treatment Plaintiff suffered or developed, along with the corresponding dates and circumstances, state the name, title, address and business telephone number of each individual, clinic, hospital, or other medical care facility providing Plaintiff's care, evaluation, treatment, advice, counseling, diagnostic, testing, consulting, or therapeutic services of any nature or kind; and whether Plaintiff sought compensation through

the filing of a law suit or by resort to any other process, explaining the results of same:

**RESPONSE:** Plaintiff objects to this interrogatory because it is overly broad, overly burdensome, duplicative of Requests for Production 5 and 7, and not proportional to the needs of the case. This interrogatory seeks highly personal and sensitive information that is unrelated to any party's legal claims or defenses. Plaintiff will only provide medical information that is relevant and proportional to the legal claims in this case. Notwithstanding these objections, please see the document provided in Plaintiff's Initial Disclosures at WILLIAMS000645–000833.

6. During the **ten years** immediately *before* the date of Plaintiff's imprisonment describe any and all **psychological, psychiatric, emotional or mental** injury or condition Plaintiff suffered or developed, along with the corresponding dates and circumstances; state the name, title, address and telephone number of **each individual, clinic, hospital, or other medical care facility** providing Plaintiff care, evaluation, treatment, advice, counseling, diagnostic, testing, consulting, or therapeutic services of any nature or kind; and state

whether Plaintiff sought compensation through filing a law suit or by

resort to any other process, explaining the results of same:

**RESPONSE:** Plaintiff objects to this interrogatory because it is overly broad,

overly burdensome, duplicative of Requests for Production 5 and 7, and not

proportional to the needs of the case. This interrogatory seeks highly personal and

sensitive information that is unrelated to any party's legal claims or defenses.

Plaintiff will only provide medical information that is relevant and proportional to

the legal claims in this case. Notwithstanding these objections, during the ten years

before Plaintiff was arrested and detained, Plaintiff suffered no psychological,

psychiatric, emotional, or mental injuries or conditions.


7.    As to this incident, list each and every **physical injury, disease, defect,**

**illness, limitation, restriction, or any condition requiring medical**

**diagnosis or treatment** Plaintiff claims were caused by the incident

underlying Plaintiff's complaint; stating specifically how the claimed

injury or condition occurred; the name, title, address and telephone

number of **each individual, clinic, hospital, or other medical care**

**facility** providing Plaintiff care, treatment, advice, evaluation,

counseling, diagnostic, testing, consulting, or therapeutic services of

any nature or kind, with corresponding dates of service; and state

whether the costs for such services are outstanding and whether

Plaintiff has applied for or received reimbursement for such services,

explaining the results of same:

**RESPONSE:** Plaintiff objects to this interrogatory because it is duplicative of

Interrogatory 9 and Requests for Production 5 and 7. Notwithstanding these

objections, see Interrogatory 9. Plaintiff may claim that injuries caused by

Defendants' actions led to any and all ailments listed in response to Interrogatory

9.

8.    As to this incident, list each and every **psychological, psychiatric,**

**emotional or mental injury or condition** Plaintiff claims was caused

by the incident underlying Plaintiff's complaint; stating specifically

how the claimed injury or condition occurred; and provide the name,

title, address and telephone number of **each individual, clinic,**

**hospital, or other medical care facility** providing Plaintiff care,

treatment, advice, evaluation, counseling, diagnostic, testing,

consulting, or therapeutic services of any nature or kind; and state

whether the costs for such services are outstanding and whether

Plaintiff has applied for or received reimbursement for such services,

explaining the results of same:

**RESPONSE:** Plaintiff objects to this interrogatory because it is duplicative of Interrogatory 9 and Requests for Production 5 and 7. Notwithstanding these objections, Plaintiff has been diagnosed with post-traumatic stress disorder (PTSD). Plaintiff was evaluated by the following individuals: (1) Charles Seigerman, Ph.D., licensed psychologist, 5925 Pinecroft Drive, West Bloomfield, Michigan, 48322, (248) 477-9940; and (2) Philip Saragoza, MD, forensic psychologist, 2395 Oak Valley Drive, Suite 100, Ann Arbor, Michigan, 48103, (734) 995-9011. No costs for these services are outstanding. Plaintiff did not apply for or receive reimbursement for these services.

9.   As to the time period ***after*** *the incident alleged in the complaint,* list each and every physical injury, disease, defect, illness, limitation, restriction, or any condition requiring medical diagnosis or treatment ***or*** psychological, psychiatric, emotional or mental injury or condition sustained; the corresponding dates and circumstances; the name, address and telephone number of each individual, clinic, hospital, or other medical care facility providing Plaintiff's care, treatment, advice, evaluation, counseling, diagnostic, testing, consulting, or therapeutic services of any nature or kind for each injury, condition, and occurrence; and whether the costs for such services are outstanding and

11

whether Plaintiff has sought compensation through the filing of a law

suit or applied for or received reimbursement for such services by any

other means, explaining the results of same:

**RESPONSE:** Plaintiff objects to this interrogatory because it is duplicative of

Requests for Production 5 and 7. Plaintiff further objects to this interrogatory as

overbroad and unduly burdensome, and not proportional to the needs of the case.

This interrogatory seeks highly personal and sensitive information that is unrelated

to any party's legal claims or defenses. Notwithstanding these objections, ██████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ Plaintiff has been

diagnosed with PTSD, as discussed in Interrogatory 8. No costs for these services

are outstanding. Plaintiff did not apply for or receive reimbursement for these

services.

In answering this Interrogatory, Plaintiff does not waive claims to any physical injury, disease, defect, illness, limitation, restriction or psychological, psychiatric, emotional, or mental injury or condition that did not require a medical diagnosis, including but not limited to the emotional and mental distress that Plaintiff and his family experienced following his arrest.

10. Please provide a complete account of your whereabouts on October 2, 2018, including:

    a.   Family, friends, acquaintances, peers, associates or colleagues with whom you interacted, including name, address, and phone number of each;

    b.   Each location you visited;

    c.   Your purpose for visiting each location;

    d.   Anyone you communicated with, in person, virtually or electronically;

    e.   Your mode of transportation to and from each location; and

    f.   The time you arrived at and left each such location.

**RESPONSE:** Plaintiff objects to this interrogatory as irrelevant to this litigation, as Plaintiff's innocence regarding the October 2, 2018, theft at Shinola is not a contested issue. Plaintiff further objects to this interrogatory as unduly

burdensome. Notwithstanding these objections, to the best of Plaintiff's memory, on October 2, 2018, Plaintiff went to work at his customary time of 8:00 AM, where he saw coworkers, and then went home at 5:00 PM, where he saw his family. Plaintiff posted a video on Instagram of himself driving home from work and singing along to the song "We Are One" by Maze featuring Frankie Beverly.

**11.** Please identify any internet social media account/website that Plaintiff used and/or maintained in the last five years, including Plaintiff's user name. "Internet social media account/website" includes but is not limited to Facebook, Facebook Messenger, Instagram, TikTok, Twitter, iMessage, Pinterest, Snapchat, LinkedIn, WhatsApp, Reddit and You Tube.

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad and not relevant to this litigation. Notwithstanding these objections, see below for Plaintiff's usernames for social media platforms where he has posted about his wrongful arrest:

   a) Facebook: ███████████████████

   b) Instagram: ████████

**12.** Did Plaintiff, or any one on Plaintiff's behalf, ***report or complain*** of any alleged condition, or actions or omissions of any employee of the City of Detroit, related to this lawsuit, **at any time _after_ Plaintiff sustained Plaintiff's alleged damages?** If so, please identify the date the report or complaint was made; whether it was made by phone, letter, in person, etc.; **by whom and to whom** the report or complaint was made; state the specific allegations or claims reported; the disposition of the report or complaint, and please attach a copy of the report or complaint of this incident along with the answers to these interrogatories:

**RESPONSE:** Plaintiff objects to this interrogatory as unduly burdensome to the extent that it asks for Defendants' own responses to reports or complaints, as Defendants are in a better position than Mr. Williams to determine the disposition of any report or complaint. Notwithstanding this objection, on June 24, 2020, Philip Mayor, Senior Staff Attorney at the American Civil Liberties Union Fund of Michigan, sent a letter via USPS and email to the Office of the Chief Investigator. The letter formally lodged a complaint on behalf of Plaintiff and his family regarding the Detroit Police Department's conduct leading to Plaintiff's wrongful arrest and the Detroit Police Department's attempts to cover up Plaintiff's wrongful arrest. The complaint stated that the Detroit Police Department

"unthinkingly relied on flawed and racist facial recognition technology without taking reasonable measures to verify the information being provided, it conducted a shoddy and incomplete investigation, its officers were rude and threatening, and it ha[d] completely failed to respond to a FOIA request seeking relevant records." For the full complaint, please see WILLIAMS001082–001084. Plaintiff also lodged the complaint precipitating this litigation.

13. If there were any witnesses **before**, **during**, **or** **after**, the incident as alleged in the complaint, **who may testify about the circumstances of the incident or to the injuries or damages Plaintiff sustained in this incident,** then please state the name, address and telephone number of each witness and relationship to Plaintiff; provide a synopsis of the anticipated testimony, state whether a statement in any form was obtained from each witness, identifying the name, title, address and telephone number of the person taking the statement in any form, and please attach a copy of such statement(s) along with the answers to these interrogatories:

**RESPONSE:** Plaintiff objects to this interrogatory to the extent it seeks information protected by the work-product doctrine and will not describe any protected conversations or information below. Notwithstanding this objection, see

below for information regarding what fact witnesses may testify about regarding

the circumstances of the incident or the injuries and damages Plaintiff sustained in

the incident as alleged in the complaint:

a) Robert Williams is the Plaintiff in this case. His address is ████
   ████████████████████████████████. Plaintiff can be
   reached via telephone or e-mail through Plaintiff's counsel. He may
   testify to his false arrest and the psychological and emotional impact
   these events have had in himself and his family. Plaintiff has not made
   a statement, other than the statements made when deposed by
   Defendants in connection with this lawsuit on October 27, 2022,
   which are in Defendants' possession.

b) Melissa Williams is Robert Williams' wife. Her address is ████
   ████████████████████████████, and her
   telephone number is ████████████. She may testify about her
   husband's false arrest and the psychological and emotional impact the
   false arrest has had on her husband and her family. Plaintiff has not
   obtained a statement from Ms. Williams.

c) Jonathan Farley is Robert Williams' best friend. His address is ████
   ████████████████████████████, and his telephone
   number is ████████████. Jarrod Kassis is Robert Williams' brother-

17

in-law. His address is ██████████████████████████ ████, and his telephone number is ████████████. Carolynn Kassis is Robert Williams' mother-in-law. Her address is ██████████ ██████████████████████████, and her telephone number is ████████████. Mr. Farley, Mr. Kassis, and Ms. Kassis may testify about the psychological and emotional impact Mr. Williams' false arrest has had on Mr. Williams, his family, and his close friends. Plaintiff has not obtained a statement from Mr. Farley, Mr. Kassis, or Ms. Kassis.

d) Katherine Johnston is a former employee of Mackinac Partners. Plaintiff does not have Ms. Johnston's address or telephone number in his possession. Hannah Phillips is a People Operations at Accordion (formerly Mackinac Partners). Plaintiff does not have Ms. Phillips's address or telephone number in his possession. Both Ms. Johnston and Ms. Phillips may testify to their involvement with DPD in the Shinola Canfield investigation. Plaintiff has not obtained a statement from Ms. Johnson, other than the statements made when deposed by Plaintiff in connection with this lawsuit on January 30, 2023. Plaintiff has not obtained a statement from Ms. Phillips.

e) Michael Oliver is another Black man who was misidentified by facial recognition technology ("FRT") and falsely arrested by DPD. Plaintiff does not have Mr. Oliver's address or telephone number in his possession. Mr. Oliver may testify to his experience as another Black man who was misidentified by FRT and falsely arrested by DPD. Plaintiff has not obtained a statement from Mr. Oliver.

f) Victoria Burton-Harris is the chief assistant prosecutor for Washtenaw County. She previously represented Mr. Williams in the criminal case brought against him following his false arrest. Ms. Burton-Harris's work address is 200 N Main St, Ann Arbor, Michigan 48104, and her work telephone number is (734) 222-6620. Ms. Burton-Harris may testify to her knowledge of the events that led to the false arrest of Robert Williams, along with her experience defending Mr. Williams in the criminal case brought against him. Plaintiff has not obtained a statement from Ms. Burton-Harris.

g) Defendant Donald Bussa is a detective at DPD. Plaintiff does not have Defendant Bussa's address or telephone number in his possession. Alaa Ali is a police officer at DPD. Plaintiff does not have Officer Ali's address or telephone number in his possession. Mohammed Salem is a police officer at DPD. Plaintiff does not have Officer

19

Salem's address or telephone number in his possession. Levan Adams is a detective at DPD. Plaintiff does not have Detective Adams's address or telephone number in his possession. James Ronan is a detective at DPD. Plaintiff does not have Detective Ronan's address or telephone number in his possession. Steven Posey is a detective at DPD. Plaintiff does not have Detective Posey's address or telephone number in his possession. Detective Benjamin Atkinson is a detective at DPD. Plaintiff does not have Detective Atkinson's address or telephone number in his possession. Rathe Yager is an intelligence specialist at DPD. Plaintiff does not have Mr. Yager's address or telephone number in his possession. Ray Saati is a sergeant at DPD. Plaintiff does not have Sergeant Saati's address or telephone number in his possession. Chimene Irvin is a sergeant at DPD. Plaintiff does not have Sergeant Irvin's address or telephone number in his possession. Rodney Cox is a lieutenant at DPD. Plaintiff does not have Lieutenant Cox's address or telephone number in his possession. Angelique Chadwick-Bills is a lieutenant at DPD. Plaintiff does not have Lieutenant Chadwick-Bills's address or telephone number in his possession. Barbara Kozloff is a lieutenant at DPD. Plaintiff does not have Lieutenant Kozloff's address or telephone number in his

possession. James Craig is the former chief of police at DPD. Plaintiff does not have Mr. Craig's address or telephone number in his possession. Kym Worthy is the prosecutor at the Wayne County Prosecutor's Office. Her work address is 1441 St Antoine, Detroit, Michigan, 48226, and her work telephone number is (313) 224-5777. Jane Gillis is an assistant prosecuting attorney at the Wayne County Prosecutor's Office. Her work address is 1441 St. Antoine, Detroit, Michigan, 48226, and her work telephone number is (313) 224-8768. Bari Blake Wood is a former magistrate at the 36th District Court in Michigan. Her work address is 3030 W Grand Blvd, Ste 9-600, Detroit, Michigan, 48202, and her work telephone number is (313) 456-0124. Defendant Bussa, Officer Ali, Officer Salem, Detective Adams, Detective Ronan, Detective Posey, Detective Atkinson, Mr. Yager, Sergeant Saati, Sergeant Irvin, Lieutenant Cox, Lieutenant Chadwick-Bills, Lieutenant Kozloff, Mr. Craig, Ms. Worthy, Ms. Gillis, and Ms. Wood may testify about their involvement in the events that led to the false arrest of Robert Williams, including the Shinola Canfield investigation and the warrant used to falsely arrest Mr. Williams. Plaintiff has not obtained a statement from Defendant Bussa, other than the statements made when deposed by Plaintiff in

connection with this lawsuit on October 24, 2022 and November 3, 2022, which are in Defendants' possession. Plaintiff has not obtained a statement from Detective Adams, other than the statements made when deposed by Plaintiff in connection with this lawsuit on November 22, 2022, which are in Defendants' possession. Plaintiff has not obtained a statement from Detective Posey, other than the statements made when deposed by Plaintiff in connection with this lawsuit on November 22, 2022, which are in Defendants' possession. Plaintiff has not obtained a statement from Detective Atkinson, other than the statements made when deposed by Plaintiff in connection with this lawsuit on November 9, 2022, which are in Defendants' possession. Plaintiff has not obtained a statement from Mr. Yager, other than the statements made when deposed by Plaintiff in connection with this lawsuit on November 8, 2022, which are in Defendants' possession. Plaintiff has not obtained a statement from Sergeant Saati, other than the statements made when deposed by Plaintiff in connection with this lawsuit on November 8, 2022, which are in Defendants' possession. Plaintiff has not obtained a statement from Lieutenant Cox, other than the statements made when deposed by Plaintiff in connection with this lawsuit on November 16, 2022,

which are in Defendants' possession. Plaintiff has not obtained a statement from Lieutenant Chadwick-Bills, other than the statements made when deposed by Plaintiff in connection with this lawsuit on December 5, 2022, which are in Defendants' possession. Plaintiff has not obtained a statement from Officer Ali, Officer Salem, Detective Ronan, Sergeant Irvin, Lieutenant Kozloff, Mr. Craig, Ms. Worthy, Ms. Gillis, or Ms. Wood.

h) Jennifer Coulson is a digital image examiner department specialist with the Michigan State Police. Plaintiff does not have Ms. Coulson's address or telephone number in his possession. Krystal Howard is a digital analysis and identification section manager with the Michigan State Police. Plaintiff does not have Ms. Howard's address or telephone number in his possession. Ms. Coulson and Ms. Howard may testify about their involvement in the events that led to the false arrest of Robert Williams, and more generally about FRT and Michigan State Police's FRT technologies and processes. Plaintiff has not obtained a statement from Ms. Coulson, other than the statements made when deposed by Plaintiff in connection with this lawsuit on January 10, 2023. Plaintiff has not obtained a statement from Ms.

Howard, other than the statements made when deposed by Plaintiff in connection with this lawsuit on January 10, 2023.

i)   James White is the chief of police at DPD. Plaintiff does not have Chief White's address or telephone number in his possession. Christopher Graveline is the associate director of administration, professional standards and constitutional policing. Plaintiff does not have Mr. Graveline's address or telephone number in his possession. Franklin Hayes is the deputy chief of police at DPD. Plaintiff does not have Deputy Chief Hayes' address or telephone number in his possession. Chief White, Mr. Graveline, and Deputy Chief Hayes may testify to official DPD policies on investigations, detective training, probable cause, FRT, and photo lineups. Mr. Hayes may also testify about their involvement in the events that led to the false arrest of Robert Williams. Plaintiff has not obtained a statement from Mr. Graveline or Chief White. Plaintiff has not obtained a statement from Deputy Chief Hayes, other than the statements made when deposed by Plaintiff in connection with this lawsuit on February 2, 2023, which will soon be in Defendants' possession.

j)   Scott Ratkowski is a Retail Operations and Inventory Manager at Shinola. Plaintiff does not have Mr. Ratkowski's address or telephone

24

number in his possession. Sabriyah Barrowcliff is a Director of Visual

Merchandising & Store Design at Shinola, and a former Area

Manager at Shinola. Plaintiff does not have Ms. Barrowcliff's address

or telephone number in his possession. James Pierce is a former Store

Manager at Shinola. Plaintiff does not have Mr. Pierce's address or

telephone number in his possession. Omari Jackson is a former

Assistant Store Manager at Shinola. Plaintiff does not have Mr.

Jackson's address or telephone number in his possession. Ranetta

Andry is a Key Holder at Shinola. Plaintiff does not have Ms. Andry's

address or telephone number in his possession. Mr. Ratkowski, Ms.

Barrowcliff, Mr. Pierce, Mr. Jackson, and Ms. Andry may testify to

their knowledge of the alleged theft at Shinola Canfield as current and

former employees of Shinola. Plaintiff has not obtained a statement

from Mr. Ratkowski, Ms. Barrowcliff, Mr. Pierce, Mr. Jackson, or

Ms. Andry.

For additional information, please see page two of Plaintiff's Initial

Disclosures. Lastly, to the extent this interrogatory pertains to Plaintiff's expert

witnesses, this information is forthcoming and will be provided pursuant to Fed. R.

Civ. P. 26(a)(2) and Fed. R. Civ. P. 26(a)(3) on the deadline set by the court.

14. List all **damage and liability expert** witnesses who have been

contacted or retained on Plaintiff's behalf, concerning this incident, by

providing the name, address and telephone number of each such

**damage and liability expert**, along with their field of specialization; as

well as a concise statement of each **damage and liability expert's**

anticipated <u>opinions and the facts</u> upon which their opinions are based;

the approximate date each **damage and liability expert** was contacted

on Plaintiff's behalf, and the name, address and telephone number of

the person contacting or retaining the **damage and liability** expert on

Plaintiff's behalf, and please attach a copy of the report concerning the

**damage and liability experts'** opinions concerning this incident along

with the answers to these interrogatories :

**RESPONSE:** The requested information and documents regarding Plaintiff's

expert witnesses are forthcoming and will be provided pursuant to Fed. R. Civ. P.

26(a)(2) and Fed. R. Civ. P. 26(a)(3) on the deadline set by the court.


15. If Plaintiff or anyone on Plaintiff's behalf took notes, measurements,

prepared drawings or sketches, or took photographs or a video of

Plaintiff, or Plaintiff's injury or of the scene, location, or condition of

the scene or location related to this incident, either before or after the

incident as alleged in the complaint, then state specifically which of the above mentioned activities were performed and state the approximate date this took place; state the name, title, address and telephone number of the person who performed any one of the above activities; and state the name, title, address and telephone number of the person who is in possession of any of the above mentioned items:

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad, unduly burdensome, vague, and not relevant to this litigation to the extent that it asks for information regarding *any* notes, measurements, drawings, sketches, photographs, or videos about Plaintiff or Plaintiff's injury that were created by Plaintiff or anyone on Plaintiff's behalf either before or after the incident as alleged in the complaint. Plaintiff further objects to this interrogatory to the extent that it asks for information protected by the attorney-client and attorney work product privileges. Notwithstanding these objections, to the best of Plaintiff's knowledge, neither Plaintiff nor anyone on Plaintiff's behalf took any of the following actions in support of or in connection with this litigation:

a) Took notes or measurements of the scene, location, or condition of the scene or location related to this incident, either before or after the incident as alleged in the complaint;

b) Prepared drawings or sketches of Plaintiff or Plaintiff's injury related to this incident, or of the scene, location, or condition of the scene or location related to this incident; or

c) Took photographs or a video of Plaintiff or Plaintiff's injury related to this incident, or of the scene, location, or condition of the scene or location related to this incident.

For the requested information regarding any notes or measurements of Plaintiff or Plaintiff's injury related to this incident, either before or after the incident as alleged in the complaint, please see the document provided in Plaintiff's Initial Disclosures at WILLIAMS000645–000833 and Responses 5, 6, and 7 to Defendants' First Request for Production of Documents to Plaintiff for any documents of this sort in Plaintiff's possession.

16. Identify all documents or any other items obtained by Plaintiff or on Plaintiff's behalf from the City of Detroit, or any agency, department, entity, jurisdiction or person, at the local, county, state, or federal level, pursuant to a Freedom of Information Request, or by any other means or sources, **related to or concerning** the incident alleged in the complaint:

**RESPONSE:** Plaintiff objects to this interrogatory as unduly burdensome to the extent that it asks for Defendants' own documents. Notwithstanding that objection, attached are documents obtained on Plaintiff's behalf from the Wayne County Prosecutor's Office via the Freedom of Information Act. See WILLIAMS001085–001134. Attached, also, are documents obtained by Plaintiff from the Wayne County Prosecutor's Office, see WILLIAMS001135–001183, and the Michigan State Police pursuant to subpoenas duces tecum, see MSP000001–000101 and WILLIAMS001184–001206.

Regarding documents obtained by Plaintiff from the City of Detroit in discovery, please see please see Defendants' Initial Disclosures and Defendants' various response to Plaintiff's various requests for production and interrogatories.

17. In your own words, please state in chronological order, setting forth the exact dates, times and in detailed order how the incident underlying Plaintiff's complaint occurred (please do not merely refer to Plaintiff's complaint or attached documents or documents in possession of the defendant(s)):

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad, unduly burdensome, duplicative of his deposition, and vague. Plaintiffs' recitation of the relevant facts of which he is personally aware are contained in his Complaint.

Defendants have also already deposed Plaintiff. Any further description of the underlying events is plainly unduly burdensome. Plaintiff is not responsible for reciting the facts as they may appear to other witnesses or involved individuals. Notwithstanding these objections, Plaintiff recounts the following to the best of his knowledge and understanding regarding his false arrest, detention, and criminal proceedings:

a) <u>January 9, 2020:</u> Officers Mohammed Salem and Alaa Ali were dispatched to execute a warrant for Mr. Williams's arrest. Before showing up at the Williams family home, the officers called Ms. Williams on the phone, masquerading as Farmington Hills police, and demanding that she get her husband to come to the police station. The officers were demeaning towards Ms. Williams, aggressively demanding that she persuade Mr. Williams to comply with their demands because she was, in the officers' words, his "baby mama." The officers called Ms. Williams and told her that Mr. Williams needed to turn himself in. Ms. Williams was confused as to the officers' demands; she did not understand what possible reason existed for the police to make such demands. The officers refused to tell Ms. Williams why they wanted Mr. Williams to come to the police station. The conversation was so absurd that Ms. Williams

believed it was a prank call. The officers next called Mr. Williams, who was at work when he received the call. The officers were again demeaning and aggressive. When Mr. Williams explained that he was at work, the officers threatened to come to his workplace and "cause a scene." Mr. Williams responded that he was leaving work soon. Mr. Williams asked why the officers wanted him to come to the police station. They refused to explain what crime they were accusing him of, stating only that it was for a "serious matter." Mr. Williams, believing like his wife that the call must have been a prank, ended the conversation and went about his day at work. At 3:12 p.m., the officers drove to Mr. Williams's Farmington Hills neighborhood in a marked police car. Two minutes later, an officer knocked on the Williamses' front door, holding a package and impersonating a delivery worker. The officers received no answer because no one was home. At one point, one of the officers walked around the side of Mr. Williams's house and peered into their back yard. For the next two hours, officers surveilled the Williams family home in a marked police car, in plain view of their neighbors. Hours after the officers first arrived, Ms. Williams returned to her home. Officers then knocked on the front door again. Ms. Williams answered. This was

when, to her surprise, she realized that the earlier call from the officers was not a prank. Ms. Williams still did not know, however, why the police officers were at her door looking for her husband. In fact, the officers never even identified themselves as police officers from Detroit; Ms. Williams had to learn that information on her own from the officers' uniforms and marked police car. And as noted earlier, when they had first called her, the officers misrepresented themselves as Farmington Hills officers. The Williams's eldest daughter, five-year-old J.W., stood at the door with her mother as the officers stated that they were there to arrest her father. Meanwhile, Mr. Williams left work and called his wife to ask what she and the daughters wanted for dinner. Ms. Williams let her husband know that police officers were at their home. At approximately 5:22 p.m., Mr. Williams returned home from work and parked in his driveway. Seconds later, DPD officers pulled their marked car diagonally behind his, jumped out of the vehicle, and arrested him. Both his five-year-old daughter and two-year-old daughter stood in the driveway, watching horrified as police officers handcuffed their father and put him into the police car. Throughout the arrest, both Mr. and Ms. Williams tried to get more information from the officers about why he

was being detained. It was only when Mr. Williams demanded to see a warrant that he learned anything at all about the basis for his arrest. Seeing the warrant was the first time he learned what he was being accused of—felony larceny. Bewildered, both Mr. and Ms. Williams tried to think of what theft in Detroit could possibly be attributed to Mr. Williams. Given that they rarely shopped in Detroit, this provoked more questions than answers. When Ms. Williams asked where her husband was being taken, the officers told her they were taking him to the Detroit Detention Center ("DDC"). When she asked for a card or some contact information, the officers told her to "Google it." Like his wife, Mr. Williams was given no information about why he was being taken into custody. Even as he was placed into the police car, Mr. Williams thought the officers were taking him to the station for some questioning, perhaps to ask Mr. Williams for an alibi for whatever incident the officers were investigating. The officers did not take Mr. Williams to a police station. They never asked him whether he had an alibi. Instead, the officers took Mr. Williams straight to the Detroit Detention Center. As Mr. Williams was torn away from his family in handcuffs, he told his five-year-old daughter that he would see her soon. It was the last thing Mr.

Williams said before being taken away by DPD officers and incarcerated in a dank concrete cell for approximately 30 hours. Mr. Williams's arresting officers took him to the Detroit Detention Center without ever telling him why he was arrested. When he asked what he was accused of stealing, they refused to explain anything to him. Jail staff processed Mr. Williams by taking his fingerprints, confiscating his possessions, and even taking his shoelaces. All the while, he tried learning why he was arrested, but no staff member told him anything. A staff member did tell him that his fingerprints may be able to reveal that he had done nothing wrong. As the processing staff took Mr. Williams's belongings, he told them that he was diabetic and needed to keep his insulin syringe to control his blood sugar level. The processing staff told him that that was not possible, and that a nurse would be available should he need it. Mr. Williams was led to a cell with roughly a dozen other men. The cell was filthy—its trash can was overflowing, its water fountain was corroded and had trash strewn on its top, and the smell of bodily fluids was pungent. Trying to pass the time, he began speaking with a cellmate, who told him that he overheard the arresting officers, who had not provided any information to Mr. Williams, telling the corrections officers that he

was arrested for stealing watches. Mr. Williams was not sure if he
could believe that, as his arresting officers consistently refused to give
him any information about why he had been arrested. Mr. Williams
was extremely hungry because he was arrested before he could eat
dinner with his family. But he was not offered dinner because he was
brought to the detention center after dinner had been served. He
waited in anticipation for his fingerprints to exonerate him, as the
processing staff led him to believe was possible.

b) January 10, 2020: At roughly 1:00 a.m., when Mr. Williams heard
corrections officers calling his name, he became hopeful that he
would soon be released. But instead of releasing him, the corrections
officers had come to take a sample of his DNA and record his palm
prints. During that time, Mr. Williams asked the corrections officers
why he was in police custody. The corrections officers were
nonresponsive. Before being led back to the cell, Mr. Williams asked
the officers if he could have a drink of water, something he had not
had since he arrived because of how disgusting the water fountain in
the cell was. The officers told him he could use his hands to drink out
of a sink, but given that Mr. Williams's hands were covered in ink
after having his palm print taken, that was not a viable option. Mr.

Williams then returned to the cell despondent, hungry, and thirsty. When Mr. Williams returned to the cell, he realized that there were fewer bed mats provided than there were people and that he didn't have a bed mat. So, unable to lie on a bed mat, he laid his six-foot-one frame on a concrete slab that was too short for his body and tried to go to sleep. Mr. Williams has back problems, and lying on the concrete aggravated his back pain. Mr. Williams did not get sleep that night. Throughout the night, Mr. Williams thought about how he did not fulfill his promise to his daughter to be home soon. He wished he could be with his wife. He worried about his job, given that his absence at work the following day would be unexplained. The following morning, Mr. Williams was brought to another room in the DDC where he was to be arraigned by video. He would not be allowed to see a judge in person. A lawyer who was appointed to assist him with his arraignment spoke to Mr. Williams for a few minutes before this arraignment, but the lawyer did not know what Mr. Williams was being charged with stealing either. When Mr. Williams made his appearance before the judge, he pled not guilty. After entering his not-guilty plea, Detective James Ronan and then-Officer Benjamin Atkinson summoned Mr. Williams to an

interrogation room. Then Detective Ronan and then-Officer Atkinson had Mr. Williams read his Miranda rights and instructed him to sign a waiver if he agreed to make a statement. Mr. Williams expressed his confusion about his Kafkaesque situation to the officers—how was he to make a statement when he did not know why he was in police custody in the first place? An officer replied by telling Mr. Williams that he would explain the reason for his arrest, but only if he would first agree to make a statement. Just to find out why he was in jail, Mr. Williams agreed to speak, and therefore signed a waiver of his right to remain silent. Mr. Williams learned that the officers were not there to explain the circumstances leading to his arrest, but instead to ask about other shoplifting incidents. The officers asked if Mr. Williams had ever been to the John Varvatos store in Detroit. Mr. Williams told them that he had never been to that store. The officers also asked Mr. Williams when he had last been to a Shinola store, as Detective Atkinson was investigating a theft at a different Shinola store. Mr. Williams told the officers that he recalled being there once, in 2014, on his brother-in-law's birthday. In response, one of the officers showed Mr. Williams a sheet of paper with an enlarged still of the Shinola surveillance footage on it. The officer then asked Mr.

Williams if he wanted to tell the truth and tell them when he had last been to the Shinola store. Amazed, Mr. Williams held up the paper to his face and said something to the effect of, "That's not me at all. Y'all can't tell that?" At that point, the officers turned over the facial recognition lead sheet, which showed the surveillance footage still and Mr. Williams's expired driver's license photo. As the officers kept showing Mr. Williams more photos from the various thefts they were investigating, Mr. Williams kept repeating that it was not him depicted. The officers seemed surprised, and after seeing Mr. Williams hold the photo up next to his face, the officers clearly realized that he was not the person in the image. Despite their acknowledgement of his wrongful arrest, the officers said they did not have the authority to release Mr. Williams. Mr. Williams then returned to the holding cell, where he was kept with roughly forty other men. Mr. Williams sensed tension brewing in the room, which led him to wonder what he would do if someone tried to physically assault him. Mr. Williams, increasingly sad and nervous, called his wife. He told her that the officers realized he wasn't the person they were looking for, but they could not promise him that he'd be released that day. He told her that if he was not released that day, he would

likely spend the weekend, which included his birthday, in jail for a crime that he did not commit. Finally, after approximately eight more hours, Mr. Williams was released subject to a personal bond. The DDC does not allow those released from custody to wait indoors. So, Mr. Williams had to wait outside on a rainy January night as his wife arranged childcare for their daughters and then drove from their home, roughly thirty minutes away. Finally, his wife arrived. Mr. Williams's thirty hours as a prisoner was over. As Mr. Williams sat in the passenger seat of his car heading home, he was relieved but realized that his ordeal was far from over. Mr. Williams thought first about his daughters. He knew that they had watched their father arrested, and he was worried about their well-being. He also recognized that he was still facing charges for retail fraud, and given the fact that he had already been falsely arrested for the crime, he was not confident that he would be acquitted. Mr. Williams also worried that he would face professional repercussions because of his arrest and wondered about how he would explain what happened to his employer. Given the fact that he was arrested in plain view of his neighbors, Mr. Williams also worried about how his neighborhood would treat him and his family. When Mr. Williams came home, he immediately noticed changes.

Prior to his arrest, the family displayed in their living room a canvas portrait of the family. Mr. Williams noticed that the portrait had been turned around. When he asked his wife why the portrait was flipped over, he discovered that J.W. had flipped it around because she and her sister cried every time they saw it.

c) <u>January 11, 2020:</u> Mr. Williams spent his birthday despondent, trying to figure out a way to create a sense of normalcy for himself and his daughters. Alongside trying to calm his daughters, Mr. Williams had to worry about hiring counsel, which he sought to hire over the coming days. The first few lawyers that Mr. Williams approached did not seem interested in his case, but they told him that they would represent him in exchange for a hefty fee. Not having a trusted lawyer while life-altering charges hung over his head left him extremely nervous. While charges were pending, Mr. Williams's employment status hung in the air. Though he continued to attend work when he wasn't looking for lawyers, Mr. Williams was certain that he'd lose his job if he was convicted and was not sure what would happen to his job status if he were put on probation or pled to a lesser offense. Fortunately, Mr. Williams eventually secured Victoria Burton-Harris as his attorney.

d) <u>January 23, 2020:</u> WCPO dismissed the charges against Mr. Williams at the next court date. The dismissal was without prejudice.

e) <u>Present:</u> Mr. Williams and his family still feel the lasting effects of the wrongful arrest. To this day, both of his daughters are still shaken to tears whenever they think of what happened to their father. Both Mr. Williams and his wife take pains to avoid exposing their daughters to things that remind them of the wrongful arrest, such as police. Nonetheless, watching their father be arrested on their front lawn was the children's first encounter with the police. Mr. Williams and his wife understandably worriy how this will impact their daughters' attitudes and development as they grow up. Neighbors have inquired about the incident, which has brought Mr. Williams embarrassment. Of course, Mr. Williams also remains distressed by what happened. Not only is he continuously pained by the indignity of being arrested, he worries about being wrongfully arrested again. He is confident that, should facial recognition continue to be used without adequate oversight, training, and standards, wrongful arrests will continue to happen. And he is deeply fearful that he will again be wrongfully arrested as a result, especially since his photos remain in the police matching database that led to his wrongful arrest and because the

DPD uses the same facial recognition technology as the MSP that

falsely identified him. Mr. Williams is also deeply aggrieved by the

fact that DPD chose to use, and continues to use, technology that is

more likely to misidentify him because of his race. He does not

believe that he should have to live with a greater fear of arrest and

thus experience less benefit from police services because of his race,

and he is distressed that DPD uses demonstrably racially biased

technology. This has and will continue to impact Mr. Williams family

life because his daughters now associate the police with their father's

false arrest rather than as a source of protection. Mr. Williams has

since been formally diagnosed with PTSD caused by the events

detailed in his complaint.

**18.** State in chronological order and in detail all actions Plaintiff took to

mitigate or reduce Plaintiff's injury or damages, or to prevent the

occurrence of the incident giving rise to the allegations in the

complaint:

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad, unduly

burdensome, and vague. Plaintiff also objects to this interrogatory to the extent that

it asks for a legal conclusion. Plaintiff further objects to the notion that he had any

agency or ability to prevent his wrongful arrest. Notwithstanding these objections, Plaintiff visited licensed psychologist Dr. Charles Seigerman, Ph.D. on August 18, 2021 and August, 20, 2021 to help mitigate Plaintiff's emotional and psychological injuries as a result of his false arrest. Plaintiff also visited forensic psychologist Dr. Philip Saragoza, MD on December 13, 2021 and December 16, 2021 to help mitigate Plaintiff's emotional and psychological injuries as a result of his false arrest.

Further, Plaintiff believes this lawsuit is a means through which he can right an injustice that has befallen him. Plaintiff also seeks to not let the wrongful actions of the Detroit Police Department define his life or his sense of self in order to mitigate the emotional and psychological damage that has plagued him.

19. Identity any newspaper, television network, internet website, radio station, or media outlet of any kind to which Plaintiff or his agents (including his attorneys) have made any statement concerning the allegations in Plaintiff's complaint.

**RESPONSE:** Plaintiff objects to this interrogatory as unduly burdensome and vague. Notwithstanding these objections, Plaintiff or his agents (including his attorneys) have made statements concerning the allegations in Plaintiff's complaint to media outlets, including the New York Times, Detroit News, WDET, Detroit

Free Press, The Washington Post, CBS News, NPR, Click On Detroit, WIRED,

and likely other media outlets that Mr. Williams cannot recall. Please conduct an

Internet search (for example, using Google) for more information.

Dated: February 7, 2023                    Respectfully submitted,

*/s/ Michael J. Steinberg*
Michael J. Steinberg (P43085)
Ben Mordechai-Strongin*
Lauren Yu*
William Ellis*
Michael Terlep*
Julia Kahn*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
bmstrong@umich.edu
laurenyu@umich.edu
mterlep@umich.edu
wwellis@umich.edu
jekahn@umich.edu

*Student Attorney practicing pursuant
to Local Rule 83.21

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
Ramis J. Wadood (P85791)
American Civil Liberties Union Fund
of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803

pmayor@aclumich.org
dkorobkin@aclumich.org
rwadood@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2023, I served the foregoing on the

attorney of record by e-mail and via Dropbox.com.

/s/ Michael J. Steinberg