## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROBERT JULIAN-BORCHAK WILLIAMS,

        Plaintiff,

v.

CITY OF DETROIT, a municipal corporation,
DETROIT POLICE CHIEF JAMES WHITE,
in his official capacity, and DETECTIVE
DONALD BUSSA, in his individual capacity,

        Defendants.

_____/

Case No. 21-cv-10827

Hon. Laurie J. Michelson

### FIRST
### AMENDED COMPLAINT

**JURY TRIAL DEMANDED**

Michael J. Steinberg (P43085)
Ben Mordechai-Strongin*
Lauren Yu*
William Ellis*
Mickey Terlep*
Julia Kahn*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
bmstrong@umich.edu
laurenyu@umich.edu
wwellis@umich.edu
mterlep@umich.edu
jekahn@umich.edu

* Student Attorney practicing pursuant to
Local Rule 83.21.

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
Ramis J. Wadood (P85791)
American Civil Liberties
  Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org
rwadood@aclumich.org

Nathan Freed Wessler
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

_____/

## FIRST AMENDED COMPLAINT

## INTRODUCTORY STATEMENT

1.   This wrongful arrest and imprisonment case exemplifies the grave harm caused by the misuse of, and reliance upon, facial recognition technology. Plaintiff Robert Williams was falsely arrested because, as Detroit police officers later admitted, the computer got it wrong and erroneously identified him as the suspect in a watch theft investigation. Nonetheless, officers secured a warrant for Mr. Williams's arrest without providing the authorizing magistrate with critical information about deficiencies in the investigation and how facial recognition technology was used. As a result, Mr. Williams was arrested without explanation on his front lawn in plain daylight in front of his wife and children, humiliated, and jailed in a dirty, overcrowded cell for approximately 30 hours where he had to sleep on bare concrete—all for no reason other than being someone a computer thought looked like a shoplifter.

2.   Mr. Williams is a forty-five-year-old Black man who lives with his wife of thirteen years and two young daughters in their home in Farmington Hills, a suburb of Detroit.

2

3.  On January 9, 2020, when Mr. Williams drove into his driveway after a day at work, two Detroit police officers arrested him in front of his family for a crime he did not commit. The officers then transported him to Detroit and locked him up in jail for 30 hours before releasing him on a personal bond, but with his criminal charge still pending.

4.  Mr. Williams was falsely accused of having shoplifted watches from a Shinola store in Detroit. The crime occurred on October 2, 2018, over a year before his arrest. The theft had been captured by a Shinola surveillance camera. The surveillance footage is poorly lit, the shoplifter's hat is obscuring his face, and the shoplifter never looked directly into the camera. Shinola's security consultant provided a DPD detective with the footage and still images from the footage. The DPD detective then submitted the image to be run through facial recognition technology, which incorrectly identified Mr. Williams as a possible match.

5.  It is well documented that facial recognition technology is flawed and unreliable under the best of circumstances. That, in part, is why many jurisdictions ban its use.

6.  According to former Detroit Police Chief James Craig, "If we were just to use the technology by itself, to identify someone, I would say 96 percent of the time it would misidentify." And facial recognition is especially

unreliable when attempting to identify Black people, when the photo used is grainy, when the lighting is bad, and when the suspect is not looking directly at the camera—all circumstances that were present here.

7.    It is also widely accepted that a "match" by facial recognition technology does not constitute probable cause to arrest a person. Probable cause must be established through independent means by obtaining reliable corroborating evidence. Indeed, as then-Chief Craig testified in a Board of Police Commissioners hearing, Defendant Detective Donald Bussa, who was responsible for the investigation and who essentially relied entirely on facial recognition, performed "clearly sloppy, sloppy investigative work," causing Mr. Williams's wrongful arrest.

8.    The entirety of Defendant Bussa's "investigation" can be quickly described. Defendant Bussa did not perform even a rudimentary investigation into Mr. Williams's whereabouts during the shoplifting incident; had he done so, he would have learned that Mr. Williams was driving home from work outside of Detroit during the event in question and could not have been the culprit. Defendant Bussa and other DPD detectives did not take witness statements from individuals who were present at the store at the time of the alleged theft, nor did they collect evidence from the scene, such as fingerprints or DNA. Instead, based on the questionable facial recognition technology

4

"match" identifying Mr. Williams as an investigative lead based on his photo from a years-old expired driver's license, Defendant Bussa prepared a six-person photo array with Mr. Williams's then-current driver's license photo and five other photos. Then, Defendant Bussa arranged a photo lineup with a security consultant representing Shinola who was not even present in the store on the day of the crime, and who had only watched the same grainy surveillance video that was already in Defendant Bussa's possession. Before participating in the lineup, the security consultant had been told by DPD officials that their lead was based upon facial recognition technology. During the lineup, the security consultant looked at a still image from the surveillance video and compared it to the photos in the array. Additionally, Defendant Bussa was present in the room—standing only three to four feet behind the detective conducting the lineup—throughout the entire process, including when the security consultant wrongly identified Mr. Williams as the suspect in the video. The photo lineup result did not include the security consultant's confidence level in her selection, nor was the lineup recorded by audio or video means.

9.      Immediately after the security consultant picked Mr. Williams from the lineup, Defendant Bussa prepared a request for an arrest warrant. The warrant request was faulty and misleading because Defendant Bussa failed

to include any exculpatory information. He hid the fact that the person who picked Mr. Williams out of the lineup had never actually seen the shoplifter in person, was already aware that facial recognition had generated an investigative lead when performing the lineup, and viewed a still image from the store's surveillance video while performing the lineup.

10. Moreover, while Defendant Bussa mentioned the facial recognition "hit," he omitted any mention of the many facts that cut strongly against the reliability of the facial recognition search.

11. Defendant Bussa also did not disclose that the facial recognition "hit" was based on Mr. Williams's *expired* driver's license photo rather than his current driver's license photo and that facial recognition had *not* generated a "hit" to Mr. Williams's then-current driver's license.

12. Defendant Bussa also failed to mention that he believed the suspect likely was also implicated in thefts from a number of other retail stores and that information DPD possessed from those other thefts—such as a license plate associated with the thief—was not in any way tied to Mr. Williams. On the basis of Defendant Bussa's misrepresentations and omissions, a magistrate issued a warrant that led to Mr. Williams's humiliating arrest and incarceration.

13.    Defendant Bussa did not receive sufficient training on probable cause, proper photo lineup procedures, or warrant requests. In fact, he did not receive any kind of training on how to be a detective before or after his promotion. Defendant Bussa's lack of training was indicative of DPD's broader failure to provide specialized training to new detectives at the time.

14.    DPD also failed to ensure that detectives followed policies pertaining to investigations, such as proper warrant submissions and photo lineup procedures.

15.    Additionally, despite facial recognition technology's well-known flaws, when the Detroit Police Department began using facial recognition technology, it had no policy governing the technology's use, and thus did not offer quality control standards, ensure peer review, or offer detectives adequate training about how facial recognition technology works or about how to properly interpret, use, or corroborate a facial recognition lead in an investigation. Then-Chief Craig has since publicly stated that the Detroit Police Department changed its policy to ensure that wrongful arrests like the arrest of Mr. Williams would never happen again.

16.    Mr. Williams brings this action under 42 U.S.C. § 1983, for violation of his Fourth Amendment right to be free of unlawful seizures. He also asserts violations of the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws

§ 37.2302(a), which demands that no governmental entity "deny an individual the full and equal enjoyment" of its public services on the basis of race. He seeks damages to compensate him for his unlawful and humiliating arrest and imprisonment, punitive damages against Defendant Bussa for recklessly disregarding his rights, attorneys' fees pursuant to 42 U.S.C. § 1988 and Mich. Comp. Laws § 37.2802, and declaratory and injunctive relief to prevent similar unconstitutional arrests in the future.

## JURISDICTION & VENUE

17.    Because this civil rights action arises under the United States Constitution, this Court has jurisdiction under Article III of the Constitution and under 28 U.S.C. §§ 1331 and 1343(3) and (4). The relief sought is authorized by the United States Constitution and by 42 U.S.C. § 1983.

18.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

19.    Declaratory relief is authorized under 28 U.S.C. §§ 2201 and 2202.

20.    Venue is proper in this Court according to 28 U.S.C. § 1391(b) because most incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Michigan and because all Parties are domiciled in the Eastern District of Michigan.

8

## PARTIES

<u>Plaintiff</u>

21.   Plaintiff Robert Williams is a forty-five-year-old father of two young girls
      and a husband of thirteen years who lives in Farmington Hills, Michigan.

<u>Defendants</u>

22.   Defendant James White is the Police Chief of the City of Detroit. He is sued
      in his official capacity. James Craig was the Police Chief of the City of
      Detroit at the time of the Detroit Police Department's investigation into the
      2018 Shinola theft and Mr. Williams's arrest; he repeatedly made public
      comments, as Detroit's top law enforcement official, about the case based
      upon his own investigations into the underlying events.[1]

23.   Defendant City of Detroit is a municipal corporation in the State of
      Michigan.

24.   At all times relevant to this Complaint, Defendant Donald Bussa was
      employed as a detective with the Detroit Police Department. Defendant
      Bussa is sued in his individual capacity.

---

[1] Then-Chief Craig was named as a defendant in his official capacity in Plaintiff's
original complaint, but he has been substituted by now-Chief James White per
Federal Rule of Civil Procedure 25(d).

## FACTUAL ALLEGATIONS REGARDING FACIAL RECOGNITION TECHNOLOGY

### The Many Flaws of Facial Recognition Systems

25.　It is well-documented that facial recognition systems are deeply flawed.

26.　Facial recognition systems are used to attempt to identify an individual by using an image of their face.

27.　As described below, facial recognition algorithms consistently misidentify Black people at far higher rates than white people.

28.　Facial recognition systems operate by analyzing the structure and details of faces to generate "faceprints" — i.e., unique digital codes corresponding to each face — and attempting to match different images of the same face using those faceprints. Because facial recognition systems function by discerning detail, misidentifications are particularly likely when the image of the face sought to be identified — the "probe image" — is not sufficiently visible and clear.

29.　To operate the technology, a user inputs the probe image into the system in hopes of finding a match.

30.　Once inputted, the system will create a faceprint by analyzing the probe image according to an "algorithm" — a set of logical steps, operationalized

through computer code, that the system follows to achieve its task of identifying the individual.

31.     Once a probe image is fed into the system, the system compares the faceprint it generates from the probe image to a database of already-generated faceprints of other images and produces an output. The form of the output varies from system to system. Because face recognition systems are inherently probabilistic (meaning they cannot say with certainty that two different images are or are not a match), they typically display a list of possible matches. These possible matches are organized in order of the algorithm's confidence in a match and displayed with the "confidence scores" or "likelihood scores" that indicate the algorithm's degree of confidence in each possible match.

32.     In part because of errors in the algorithms and variations in the data they process, and in part because the output will often include several individuals with varying associated confidence scores, search results are not to be considered positive identifications. The technology is not designed to assert that the first-returned result, or any of the returned results, is an actual match.

33.   As shown below, using facial recognition systems involves risk of error—error which, in the law enforcement context, has grave consequences for the misidentified individual.

### The accuracy of a facial recognition search depends heavily on the quality of the probe image.

34.   Facial recognition systems are prone to user error because the user has leeway in selecting which probe image to feed to the system.

35.   Inputting low-quality probe images will likely produce inaccurate results, a problem referred to as "garbage in, garbage out."[2]

36.   Because facial recognition technology operates by matching details in a probe image to details in database images, it is well established that facial recognition searches are less accurate if the probe image is of low quality.[3]

37.   Four qualities of a probe image are particularly important for an accurate facial recognition search: (1) the lighting, (2) the angle at which the face is captured in the image, (3) the image resolution, and (4) facial obstruction.

---

[2] Clare Garvie, Ctr. on Privacy & Tech., *Garbage In, Garbage Out: Face Recognition on Flawed Data* 2 (May 16, 2019), https://www.flawedfacedata.com/.

[3] *E.g.* Li et al., *Face Recognition in Low Quality Images: A Survey*. 1 ACM Comput. Surv. 1 (2019), *available at* https://arxiv.org/pdf/1805.11519.pdf.

38.     Poor lighting in a probe image significantly increases the risk of an

        inaccurate match.[4]

39.     Similarly, the angle at which the face is captured in the probe image affects

        the system's performance. The facial recognition system is more likely to

        produce an accurate match if the person's face is directly facing the camera.

        A face angled away from the camera undermines the system's accuracy.[5]

40.     Further, the resolution of the probe image is crucial.[6] Put simply, blurry

        photos obscure details essential to the accuracy of the facial recognition

        search.

---

[4] *E.g.*, Patrick Grother et al., Nat'l Inst. of Standards & Tech., *Ongoing Face Recognition Vendor Test (FRVT) Part 2: Identification* 7 (Nov. 2018), https://doi.org/10.6028/NIST.IR.8238 ("Poor quality photographs undermine recognition, either because the imaging system is poor (lighting, camera etc.) or because the subject mis-presents to the camera (head orientation, facial expression, occlusion etc.)").

[5] *E.g.*, Hisateru Kato et al., *A Real-Time Angle- and Illumination-Aware Face Recognition System Based on Artificial Neural Network* (Aug. 16, 2012), https://www.hindawi.com/journals/acisc/2012/274617/ ("[A]bout 75% of the authentication failure is due to the fact that angle of orientation of the probe face image is different from the stored image.").

[6] Li et al., *supra* note 2; Al-Maadeed et al., *Low-quality Facial Biometric Verification Via Dictionary-based Random Pooling*, 52 Pattern Recognition 238 (2015).

13

41.   Moreover, if facial details are obscured by objects such as hats, masks, scarves, eye patches, etc., the accuracy of the facial recognition search will be diminished.[7]

42.   Inputting a low-quality image, such as a grainy photo or a photo where the individual's face is obstructed, heightens the risk that an innocent individual will be misidentified as a match.

43.   For example, a 2017 National Institute of Standards and Technology ("NIST") report tested dozens of facial recognition algorithms' accuracy in different settings. Researchers found that facial recognition algorithms were far more accurate in well-lit environments where individuals are facing forward, such as airport boarding gates, than in poorly lit environments where individuals are facing unpredictable directions, such as sporting events.

44.   Recognizing this, many facial recognition system providers emphasize the importance of probe image quality to their users. For example, DataWorks, in its solicitation of a contract with the Detroit Police Department ("DPD"),

---

[7] *E.g.* Hazım Kemal Ekenel & Rainer Stiefelhagen, *Why Is Facial Occlusion a Challenging Problem?*, *in* Advances in Biometrics 299 (Massimo Tistarelli & Mark S. Nixon eds., 2009), https://doi.org/10.1007/978-3-642-01793-3_31.

states that probe images may be "unsearchable" without sufficient angle and

lighting correction.

<u>Facial recognition algorithms are racially biased.</u>

45.  While careful users can decline to use low-quality probe images, they cannot

avoid the fact that facial recognition algorithms misidentify people of color

at significantly higher rates than white people.[8]

46.  For many years, researchers have understood that facial recognition systems

are racially biased—Black individuals are up to *one hundred* times more

likely to be misidentified by facial recognition systems than white men.[9]

47.  This racial bias is embedded into the facial recognition system, in part,

because the algorithm is "trained" on racially skewed data—meaning that

most algorithms were built by analyzing a data set consisting primarily of

white (male) faces.[10] For instance, one prominent training dataset consisted

---

[8]  *See* Steve Lohr, *Facial Recognition Is Accurate, if You're a White Guy*, N.Y Times (Feb. 9, 2018), https://www.nytimes.com/2018/02/09/technology/facial-recognition-race-artificial-intelligence.html.

[9]  Nat'l Inst. of Standards & Tech., *NIST Study Evaluates Effects of Race, Age, Sex on Face Recognition Software* (Dec. 19, 2019),

https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software.

[10]  J.G. Cavazos et. al., *Accuracy Comparison Across Face Recognition Algorithms: Where Are We on Measuring Race Bias?*, 3 IEEE Transactions on

of 83.5% white individuals.[11] Because facial recognition algorithms are trained primarily on white faces, they perform poorly in identifying people of color.

48.   In addition, bias is also introduced because digital cameras often fail to provide the degree of color contrast that the algorithm needs to produce and match faceprints from photos of darker-skinned faces.[12]

49.   A 2017 study by the National Institute of Standards and Technology of 140 face recognition algorithms found that problems with false positives "exist broadly," and that "false positive rates are highest in West and East African and East Asian people, and lowest in Eastern European individuals. This effect is generally large, with a factor of 100 more false positives between countries."[13]

---

Biometrics, Behavior, and Identity Science, 1, 101 (2021), https://arxiv.org/pdf/1912.07398.pdf.

[11] Joy Buolamwini & Timnit Gebru, *Gender Shades: Intersectional Accuracy Disparities in Commercial Gender Classification*, 81 Proceedings on Machine Learning Research 77, 79 (2018).

[12] GEORGETOWN LAW CTR. ON PRIVACY & TECH, THE PERPETUAL LINE-UP: UNREGULATED POLICE FACE RECOGNITION IN AMERICA 54 (2016), https://www.perpetuallineup.org/.

[13] PATRICK GROTHER, MEI NGAN & KAYEE HANOAKA, NAT'L INST. STANDARDS & TECH., INTERNAL REP. 8280, FACE RECOGNITION VENDOR TEST (FRVT) PART 3: DEMOGRAPHIC EFFECTS 3 (2019)

50.    Both DPD and the Michigan State Police contract with DataWorks, a

company that provides the shell within which other vendors' facial

recognition algorithms can be run. While the DataWorks program can

interface with any facial recognition algorithm, the company recommends

using either the Rank One Computing algorithm ("ROC") or the NEC

Corporation algorithm ("NEC").

51.    The NIST study found that the two algorithms that ROC submitted for

testing misidentified Black individuals at far higher rates than white

individuals.[14] NEC did not submit its algorithms for testing in the false

match rate section of the NIST study.

52.    Importantly, the NIST study used only high-quality photographs to test these

algorithms' accuracy.[15] Researchers have since found that low-quality

_____

[14] *See* PATRICK GROTHER, MEI NGAN & KAYEE HANOAKA, NAT'L INST. STANDARDS
& TECH., INTERNAL REP. 8280, FACE RECOGNITION VENDOR TEST (FRVT) PART 3:
DEMOGRAPHIC EFFECTS – ANNEX 7 184-87 (2019)
https://pages.nist.gov/frvt/reports/demographics/annexes/annex_07.pdf; *id.* at
ANNEX 17 at 31, 37-38.

[15] PATRICK GROTHER, MEI NGAN & KAYEE HANOAKA, NAT'L INST. STANDARDS &
TECH., INTERNAL REP. 8280, FACE RECOGNITION VENDOR TEST (FRVT) PART 3:
DEMOGRAPHIC EFFECTS 9 (2019),
https://nvlpubs.nist.gov/nistpubs/ir/2019/NIST.IR.8280.pdf (explaining that the
study "did not use image data from the Internet nor from video surveillance. This
report does not capture demographic differentials that may occur in such
photographs.")

images exacerbate these disparate false-match rates.[16] Law enforcement practices already disproportionately harm people of color; racially biased tools like facial recognition systems only compound the problem.

Cities across the country are banning the use of
facial recognition systems in policing.

53.     Due to widespread public scrutiny of the technology and its various flaws, there has been an increasing awareness that facial recognition systems are inaccurate and dangerous.

54.     A growing number of jurisdictions have officially recognized the dangers of facial recognition systems in policing. Since 2019, at least 20 jurisdictions in the United States have banned their police departments from using facial recognition systems, including San Francisco; Boston; Minneapolis; Jackson, Mississippi; King County, Washington; and the state of Vermont.[17]

---

[16] J.G. Cavazos et. al., *Accuracy Comparison Across Face Recognition Algorithms: Where Are We on Measuring Race Bias?*, 3 IEEE TRANSACTIONS ON BIOMETRICS, BEHAVIOR, AND IDENTITY SCIENCE, 1, 101 (2021), https://arxiv.org/pdf/1912.07398.pdf (explaining that "as item challenge level increased demographic differences were magnified").

[17] Fight for the Future, *Ban Facial Recognition*, https://www.banfacialrecognition.com/map/ (last accessed Feb. 28, 2023); Kate Conger et al., *San Francisco Bans Facial Recognition Technology* (May 14, 2019), N.Y. TIMES, https://www.nytimes.com/2019/05/14/us/facial-recognition-ban-san-francisco.html; Ally Jarmanning, Boston Lawmakers Vote to Ban Use of Facial Recognition Technology by the City (June 24, 2020), NPR,

18

55.    For example, Ricardo Arroyo, the City Councilor who sponsored Boston's

bill banning facial recognition technology, reasoned that the technology "has

an obvious racial bias" and "also has sort of a chilling effect on civil

liberties."[18] Boston's Police Commissioner did not oppose the ban.[19]

## FACTUAL ALLEGATIONS REGARDING MR. WILLIAMS'S FALSE ARREST

### Shinola Incident

56.    On October 2, 2018, an unknown individual entered a Shinola store in

Detroit, Michigan, and stole five watches.

57.    The shoplifter spent exactly two minutes in the store, where he was recorded

on the store's security cameras.

58.    At no point did the security cameras capture clear footage of the shoplifter.

59.    The individual's back was turned to the cameras for the vast majority of the

two minutes of footage.

---

https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/24/883107627/boston-lawmakers-vote-to-ban-use-of-facial-recognition-technology-by-the-city; Kayode Crown, *Jackson Bans Facial Recognition Tech* (Aug. 20, 2020), https://www.jacksonfreepress.com/news/2020/aug/20/jackson-bans-facial-recognition-tech-new-airport-a/.

[18] Ally Jarmanning, *Boston Bans Use of Facial Recognition Technology. It's the 2nd-Largest City to Do So,* WBUR (June 24, 2020), https://www.wbur.org/news/2020/06/23/boston-facial-recognition-ban.

[19] *Id.*

60.   Even when the shoplifter was facing the cameras, he was wearing a St. Louis

Cardinals baseball hat and often had his head angled downwards. As a

result, the cameras never captured a clear picture of his face.

61.   When the individual's face appears in the surveillance footage, it is captured

from above and afar and is only partially visible, with details of the face

obscured by the hat's brim and shadow.

62.   In addition to the security footage, there was at least one eyewitness in the

store—a Shinola salesperson—who spoke with the shoplifter face-to-face, in

a well-lit area of the sales floor, for about twenty-five seconds prior to the

theft.

<u>Defendant Bussa's investigation impermissibly relies on facial recognition
technology.</u>

63.   Shinola reported the theft to the Wayne State University Police on October

5, 2018.

64.   The Wayne State University Police then produced an initial factual report

and obtained Shinola's security camera footage.

65.   On October 6, 2018, the Wayne State University Police transferred the

investigation to the Detroit Police Department.

66.   For over five months after learning about the Shinola incident, DPD's

investigation lay stagnant, and it made no attempts to investigate.

67. It was not until March 8, 2019, that the DPD made its first investigatory attempt. Resorting to facial recognition technology as his first method of investigation, DPD investigator Levan Adams decided to use a still image from the Shinola surveillance footage to conduct a facial recognition search.

68. As described above, the Shinola surveillance footage never provided a clear image of the shoplifter's face.

69. The still image used by Detective Adams was plainly unfit for use in a facial recognition search, as would have been evident had Detective Adams received even rudimentary training on the proper use of facial recognition technology:



70. As can be seen, the individual's face in the low-resolution image is barely visible, poorly illuminated, oriented away from the camera, and partially obscured by his hat.

71.   As then-Chief Craig conceded in a July 9, 2020, Board of Police Commissioners meeting, "the image … that was used in facial recognition is blurry."

72.   As described in paragraphs 34-44, low-quality probe images that do not reveal facial details are likely to lead to misidentifications.

73.   In addition, the individual pictured appears to be Black.

74.   As shown in paragraphs 45-52, facial recognition technology is significantly more likely to misidentify Black people than white people.

75.   Despite a plethora of reasons suggesting that the still was unfit to be a probe image, Detective Adams decided to use it to conduct a facial recognition search. Detective Adams sent the image with a search request to DPD Crime Intelligence Analyst Rathe Yager.

76.   Upon receiving Detective Adams' request, Yager forwarded the request to the Michigan State Police.

77.   As described in paragraphs 209-229 below, there was no DPD policy on the use of facial recognition technology in effect at the time. DPD policy provided no instructions whatsoever as to what type of probe images met minimum quality standards.

78.    On March 11, 2019, the Michigan State Police returned the result of the facial recognition search to the DPD. The report, entitled "Investigative Lead Report," identified Mr. Williams as an investigative lead.

79.    The image of Mr. Williams that purportedly matched the probe image was an expired driver's license photo. Mr. Williams has a newer driver's license photo on file with the State of Michigan, but that newer image did *not* present as a likely match for the suspect.

80.    The following statement appeared prominently on the Investigative Lead Report, in the form shown: "**THIS DOCUMENT IS NOT A POSITIVE IDENTIFICATION. IT IS AN INVESTIGATIVE LEAD ONLY AND IS <u>NOT</u> PROBABLE CAUSE TO ARREST. FURTHER INVESTIGATION IS NEEDED TO DEVELOP PROBABLE CAUSE TO ARREST**." The phrase "INVESTIGATIVE LEAD ONLY" was highlighted in red ink.

81.    The Investigative Lead Report contains neither the "confidence score" generated by the facial recognition system representing the level of confidence that Mr. Williams's expired driver's license photo matched the person pictured in the probe image, nor the other possible matches that were returned by the system.

23

82.     The Detroit Police Department did not attempt to ascertain the "confidence

        score" generated by the facial recognition search nor request the other

        possible matches to the probe photo.

83.     Defendant Bussa was aware that the investigative lead contained an outdated

        photo because, as described in paragraph 88 below, he used Mr. Williams's

        current driver's license photo when he compiled photos for a photo lineup.

        Despite this apparent issue, Defendant Bussa never inquired with the

        Michigan State Police about the procedures they used to generate the lead or

        the confidence they had in this investigative lead. Additionally, Defendant

        Bussa was never trained on how facial recognition works or how to assess

        the reliability of an investigative lead generated by facial recognition.

        <u>Defendant Bussa follows the previously generated facial recognition lead despite
        the flaws of the prior search.</u>

84.     On May 14, 2019, Defendant Donald Bussa assumed responsibility for

        investigating the Shinola incident.

85.     By the time Defendant Bussa took control of the Shinola investigation, new

        facial recognition policies, described in paragraphs 212-222 (the "April

        training directive" and the "April CIU SOP"), were in effect.

86.     As described in paragraphs 230-235, a subsequent policy adopted several

        months later but prior to the arrest of Mr. Williams (the "September policy")

acknowledged several probe image factors that affect facial recognition technology's reliability and required peer review.

87.   Defendant Bussa, however, ignored the new policies, and DPD failed to ensure that detectives were familiar with the contents of the April CIU SOP. Furthermore, DPD failed to make detectives apply any of the new policies to cases where facial recognition searches had already been conducted. Even though the facial recognition search "identifying" Mr. Williams as the shoplifter was generated by a woefully substandard probe image and had never been peer reviewed by DPD personnel, as required by the April CIU SOP and the September policy, Defendant Bussa decided to rely on the lead anyway.

<u>Defendant Bussa arranges an identification procedure with a person who neither witnessed the theft nor saw the shoplifter.</u>

88.   As part of his so-called "investigation," Defendant Bussa assembled a six-pack photo array that included Mr. Williams's then-current driver's license photo alongside five other individuals' photos.

89.   Defendant Bussa attempted and failed to conduct a photo array identification with individuals who were present in the Shinola store during the incident.

90.   On June 3, 2019, Defendant Bussa spoke with a Shinola representative who told him that Shinola was not interested in forcing their employees to appear in court.

91.   On June 18, 2019, Defendant Bussa again attempted to conduct a six-pack photo identification procedure with a Shinola employee, but the employee never participated in the identification procedure.

92.   Defendant Bussa then arranged to conduct a six-pack photo identification with Katherine Johnston. Ms. Johnston, then employed by Mackinac Partners, was contracted by Shinola for loss prevention services.

93.   Defendant Bussa had no legitimate basis whatsoever for asking Ms. Johnston to participate in an identification procedure. Ms. Johnston was not an eyewitness. Ms. Johnston was not in the Shinola store at the time of the incident and has never seen Mr. Williams or the alleged shoplifter in person. Indeed, Ms. Johnston's sole relation to the incident was that she had watched the same low-quality surveillance video that Detective Bussa possessed.

94.   As detailed in paragraphs 58-61, the footage is of a low quality and never provides a clear view of the shoplifter's face.

95.   Nevertheless, on July 30, 2019, Defendant Bussa and Detective Steve Posey conducted the photographic lineup with Ms. Johnston.

96.     The photo array was not a blind procedure—Defendant Bussa knew that Mr.

Williams was the suspect and was within Ms. Johnston's eyeline. In

addition, Detective Posey had informed Ms. Johnston that there was already

a facial recognition "match" for the suspect.

97.     While viewing the photo array, Ms. Johnston was allowed to look at an

image from the Shinola security camera footage of the suspect that she

brought with her. Ms. Johnston compared the photos in the photo array to

the image she brought to the station in order to attempt an identification. As

Ms. Johnston was comparing the images, Defendant Bussa and Detective

Posey were standing just beside her.

98.     With Defendant Bussa and Detective Posey still standing mere feet away,

Ms. Johnston identified Mr. Williams's license photo as matching the person

she had seen in the grainy surveillance footage, and answered the question

"Where do you recognize him from?" with "10/2/18 shoplifting at Shinola's

Canfield store."

                    Defendant Bussa produces misleading request for warrant.

99.     With nothing more than the facial recognition system's patently unreliable

lead and Ms. Johnston's non-eyewitness "identification," Defendant Bussa

concluded his investigation.

100.   On the very same day that Johnston made her "identification," Defendant

Bussa wrote out a Request for Warrant ("RFW").

101.   The RFW is what the Detroit Police Department uses as an investigating

officer's affidavit in support of a warrant. As an affidavit, the RFW must

honestly and accurately represent the state's basis for a warrant to the

magistrate.

102.   Defendant Bussa did not accurately or honestly represent either the facial

recognition match or Ms. Johnston's identification.

103.   Indeed, Defendant Bussa's RFW contained such glaring misrepresentations

and omissions about both pieces of "evidence" that they cannot be the

product of mere negligence alone — they demonstrate deliberateness or

recklessness.

104.   Defendant Bussa's RFW stated that Johnston identified Mr. Williams from a

six-pack photo array without disclosing that Johnston was not an eyewitness.

105.   Consequently, the RFW never revealed the sole basis for Ms. Johnston's

identification: watching low-quality surveillance footage that never clearly

showed the suspect's face.

106.   The RFW also did not mention that Ms. Johnston had never seen Mr.

Williams in person, or that Ms. Johnston is white and Mr. Williams is Black.

Nor did it disclose that Ms. Johnston already knew that DPD had identified a

suspect through facial recognition technology or that she referred to a still image of the suspect captured from the surveillance video while performing the lineup. All of these are factors that make misidentification more likely.

107. The "Investigation" section of the RFW also did not mention that Defendant Bussa attempted but failed to meet with the actual eyewitnesses before arranging Ms. Johnston's participation in the identification procedure.

108. Any reasonable officer should have known that a magistrate considering whether to issue a warrant would need to know that an "identification" upon which the warrant was based was performed by someone who was not in fact an eyewitness to the crime and who already knew that a suspect had been identified through facial recognition technology. Defendant Bussa's RFW described the facial recognition lead in a similarly dishonest manner, omitting key details that go to the evidence's reliability.

109. As described below, in paragraphs 212-216, at the time Defendant Bussa wrote the RFW, he received, had knowledge of, or had access to DPD's April training directive and the April CIU SOP governing facial recognition, as well as news articles and technical literature informing him of the factors that affect probe image quality: image resolution, lighting, face orientation, obstruction, and the race of the individual in the probe image.

110.  In the RFW, Defendant Bussa reported simply that "Video and stills were sent to Crime Intel for facial recognition. Facial recognition came back with a hit for suspect Robert Julian-Borchak Williams." Defendant Bussa failed to disclose that the probe image used to generate that lead was a blurry, dark image that showed an obstructed, barely visible face turned away from the camera. He also did not mention that facial recognition technology is known to be less reliable under all of these circumstances. Nor did he disclose that the image of Mr. Williams that "matched" was actually his expired driver's license rather than the most current image of him on file with the State.

111.  Moreover, Defendant Bussa did not disclose that facial recognition technology is substantially less accurate when identifying Black people, and that the person in the probe image is Black.

112.  Defendant Bussa further did not disclose the "confidence score" that would have signified the facial recognition system's confidence that the probe image and Mr. Williams's expired license photo depicted the same person.

113.  Moreover, despite the Investigative Lead Report's emphasis that the facial recognition lead "IS NOT A POSITIVE IDENTIFICATION" and is merely "AN INVESTIGATIVE LEAD ONLY," and despite DPD policy's emphasis that facial recognition results are "NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION" (capitalization in original), Defendant

Bussa presented the facial recognition result as a "hit," thus expressing an unjustifiable and factually inaccurate confidence in the search results.

114. Before submitting his warrant request to the Wayne County Prosecutor's Office, Defendant Bussa asked a supervisor in Centralized Timekeeping, Sergeant Ray Saati, to provide supervisory approval of the request. Defendant Bussa asked Sergeant Saati for approval because no supervisor in his formal chain of command was present in the office at that time. Defendant Bussa went outside the chain of command rather than waiting until the next day to finalize the warrant request, despite the fact that the "investigation" had already dragged on for months with no apparent sense of urgency.

115. Sergeant Saati worked in a primarily administrative role. He had no investigative experience or specialized training in investigations. He had no specialized training on what constitutes probable cause. Despite his lack of investigative experience and training, Sergeant Saati provided supervisory approval and signed Defendant Bussa's RFW.

116. This type of supervisory approval outside an officer's formal chain of command, when no such supervisor was available at the office, was customary in the Third Precinct at the time.

117. On July 31, 2019, Defendant Bussa submitted the RFW to the Wayne County Prosecutor's Office.

118. Defendant Bussa did not submit the surveillance video to the Wayne County Prosecutor's Office.

119. On August 24, 2019, the Wayne County Prosecutor's Office authorized Defendant Bussa to seek a warrant to arrest Mr. Williams for retail fraud in the first degree (Mich. Comp. Laws § 750.356c).

120. Defendant Bussa's RFW was then presented to a magistrate on August 25, 2019.

121. Defendant Bussa did not submit the surveillance video to the magistrate.

122. Because Defendant Bussa described the minimal "evidence" he possessed with material misrepresentations and omissions, and because he failed to disclose numerous exculpatory facts that were known to him at the time of the request, the magistrate authorized the issuance of an arrest warrant for Mr. Williams.

<u>Plaintiff Robert Williams</u>

123. Robert Williams is a forty-five-year-old father who was born in Detroit's west side and attended Cooley High School and later earned his GED. He has never been convicted of a crime.

124. Mr. Williams is a proud dad of two daughters, J.W. and R.W., ages nine and five. Above all, Mr. Williams cherishes being a good father and role model to his daughters.

125. Mr. Williams, his daughters, and his wife of thirteen years, Melissa Williams, live in a residential neighborhood in Farmington Hills.

126. Mr. Williams is a logistics planner in the automotive industry and has worked at his current company for ten years.

127. When Mr. Williams is not working, he enjoys playing with his daughters, grilling food for his family and neighbors, and playing basketball.

128. While Mr. Williams owns a few watches, only one of them—a gift from his employer for his ten-year employment anniversary—is from Shinola.

129. In fact, the only time that Mr. Williams has ever stepped foot inside a Shinola store was more than eight years ago, in June of 2014, when he went to peruse the store with his wife and infant daughter for his brother-in-law's birthday.

<u>Wrongful Arrest</u>

130. On January 9, 2020, Detroit Police Department officers drove to Robert Williams's home to arrest him for a crime that he did not commit. This happened over four months after the warrant was issued for his arrest, and over three months after DPD updated its facial recognition policy, as

33

described in paragraphs 230-235 (the "September policy"), to prohibit the use of facial recognition technology in cases involving non-violent theft offenses.

131. Before showing up at the Williams family home, DPD officers called Melissa Williams on the phone, masquerading as Farmington Hills police, and demanding that she get her husband to come to the police station.

132. The officers were demeaning towards Ms. Williams, aggressively demanding that she persuade Mr. Williams to comply with their demands because she was, in the officers' words, his "baby mama."

133. Ms. Williams was confused as to the officers' demands; she did not understand what possible reason existed for the police to make such demands. The officers refused to tell Ms. Williams why they wanted Mr. Williams to come to the police station. The conversation was so absurd that Ms. Williams believed it was a prank call.

134. The officers next called Mr. Williams, who was at work when he received the call.

135. The officers were again demeaning and aggressive. When Mr. Williams explained that he was at work, the officers threatened to come to his workplace and "cause a scene." Mr. Williams responded that he was leaving work soon. This may be the only thing that prevented Mr. Williams from

being arrested in front of his bosses and co-workers—and quite possibly

being fired as a result.

136.   Mr. Williams asked why the officers wanted him to come to the police

station. They refused to explain what crime they were accusing him of,

stating only that it was for a "serious matter."

137.   Mr. Williams, like his wife, believed that the call must have been a prank.

He ended the conversation and went back to work.

138.   As captured on police vehicle and body-camera footage, at 3:12 p.m., DPD

officers drove to Mr. Williams's Farmington Hills neighborhood in a marked

police car.

139.   Two minutes later, an officer knocked on the Williamses' front door,

holding a package and impersonating a delivery worker. The officers

received no answer because no one was home. At one point, one of the

officers walked around the side of Mr. Williams's house, and peered in their

back yard.

140.   For the next two hours, officers surveilled the Williams family home in a

marked police car, in plain view of their neighbors.

141.   Hours after DPD officers first arrived, Ms. Williams returned to her home.

142.   Officers then knocked on the front door again. Ms. Williams answered. This was when, to her surprise, she realized that the earlier call from DPD officers was not a prank.

143.   Ms. Williams still did not know, however, why the police officers were at her door looking for her husband. In fact, the officers never even identified themselves as police officers from Detroit; Ms. Williams had to learn that information on her own from the officers' uniforms and marked police car. And as described in paragraph 131 above, when they had first called her, the officers misrepresented themselves as Farmington Hills officers.

144.   The Williams's eldest daughter, five-year-old J.W., stood at the door with her mother as the officers stated that they were there to arrest her father.

145.   Meanwhile, Mr. Williams left work and called his wife to ask what she and the daughters wanted for dinner. Ms. Williams let her husband know that police officers were at their home.

146.   At approximately 5:22 p.m., Mr. Williams returned home from work and parked in his driveway.

147.   Seconds later, DPD officers pulled their marked car diagonally behind his, jumped out of the vehicle, and arrested him.

148.   Both his five-year-old daughter and two-year-old daughter stood in the driveway, watching horrified as police officers handcuffed their father and put him into the police car.

149.   Throughout the arrest, both Mr. and Ms. Williams tried to get more information from the officers about why he was being detained. It was only when Mr. Williams demanded to see a warrant that he learned anything at all about the basis for his arrest.

150.   Seeing the warrant was the first time he learned what he was being accused of—felony larceny. Bewildered, both Mr. and Ms. Williams tried to think of what theft in Detroit could possibly be attributed to Mr. Williams. Given that they rarely shopped in Detroit, this provoked more questions than answers.

151.   When Ms. Williams asked where her husband was being taken, the officers told her they were taking him to the Detroit Detention Center. When she asked for a card or some contact information, the officers told her to "Google it."

152.   Like his wife, Mr. Williams was given no information about why he was being taken into custody. Even as he was placed into the police car, Mr. Williams thought the officers were taking him to the station for some questioning, perhaps to ask Mr. Williams for an alibi for whatever incident the officers were investigating.

37

153.   The officers did not take Mr. Williams to a police station. They never asked

him whether he had an alibi. Instead, the officers took Mr. Williams straight

to the Detroit Detention Center.

154.   As Mr. Williams was torn away from his family in handcuffs, he told his

five-year-old daughter that he would see her soon. It was the last thing Mr.

Williams said before being taken away by DPD officers and incarcerated in

a dank concrete cell for approximately 30 hours.

<u>Wrongful Imprisonment</u>

155.   Mr. Williams's arresting officers took him to the Detroit Detention Center

without ever telling him why he was arrested. When he asked what he was

accused of stealing, they refused to explain anything to him.

156.   Jail staff processed Mr. Williams by taking his fingerprints, confiscating his

possessions, and even taking his shoelaces. All the while, he tried learning

why he was arrested, but no staff member told him anything. A staff member

did tell him that his fingerprints may be able to reveal that he had done

nothing wrong.

157.   As the processing staff took Mr. Williams's belongings, he told them that he

was diabetic and needed to keep his insulin syringe to control his blood

sugar level. The processing staff told him that that was not possible, and that

a nurse would be available should he need it.

158.   Mr. Williams was led to a cell with roughly a dozen other men. The cell was filthy — its trash can was overflowing, its water fountain was corroded and had trash strewn on its top, and the smell of bodily fluids was pungent.

159.   Trying to pass the time, he began speaking with a cellmate, who told him that he overheard the arresting officers, who had not provided any information to Mr. Williams, telling the corrections officers that he was arrested for stealing watches. Mr. Williams was not sure if he could believe that, as his arresting officers consistently refused to give him any information about why he had been arrested.

160.   Mr. Williams was extremely hungry because he was arrested before he could eat dinner with his family. But he was not offered dinner because he was brought to the detention center after dinner had been served. He waited in anticipation for his fingerprints to exonerate him, as the processing staff led him to believe was possible.

161.   At roughly 1:00 a.m., when Mr. Williams heard corrections officers calling his name, he became hopeful that he would soon be released.

162.   But instead of releasing him, the corrections officers had come to take a sample of his DNA and record his palm prints.

163.   During that time, Mr. Williams asked the corrections officers why he was in police custody. The corrections officers were nonresponsive.

164. Before being led back to the cell, Mr. Williams asked the officers if he could have a drink of water, something he had not had since he arrived because of how disgusting the water fountain in the cell was. The officers told him he could use his hands to drink out of a sink, but given that Mr. Williams's hands were covered in ink after having his palm print taken, that was not a viable option. Mr. Williams then returned to the cell despondent, hungry, and thirsty.

165. When Mr. Williams returned to the cell, he realized that there were fewer bed mats provided than there were people and that he didn't have a bed mat.

166. So, unable to lie on a bed mat, he laid his six-foot-one frame on a concrete slab that was too short for his body, and tried to go to sleep.

167. Mr. Williams has back problems, and lying on the concrete aggravated his back pain.

168. Mr. Williams did not get sleep that night. Throughout the night, Mr. Williams thought about how he did not fulfill his promise to his daughter to be home soon. He wished he could be with his wife. He worried about his job, given that his absence at work the following day would be unexplained.

169. The following morning, Mr. Williams was brought to another room in the Detroit Detention Center where he was to be arraigned by video. He would not be allowed to see a judge in person. A lawyer who was appointed to

assist him with his arraignment spoke to Mr. Williams for a few minutes before this arraignment, but the lawyer did not know what Mr. Williams was being charged with stealing either.

170. When Mr. Williams made his appearance before the judge, he pled not guilty.

171. After entering his not-guilty plea, two investigators summoned him to an interrogation room.

172. The officers had Mr. Williams read his *Miranda* rights and instructed him to sign a waiver if he agreed to make a statement.

173. Mr. Williams expressed his confusion about his Kafkaesque situation to the officers — how was he to make a statement when he did not know why he was in police custody in the first place?

174. An officer replied by telling Mr. Williams that he would explain the reason for his arrest, but only if he would first agree to make a statement.

175. Just to find out why he was in jail, Mr. Williams agreed to speak, and therefore signed a waiver of his right to remain silent.

176. Mr. Williams learned that the officers were not there to explain the circumstances leading to his arrest, but instead to ask about other shoplifting incidents.

177.  The officers asked if Mr. Williams had ever been to the John Varvatos store in Detroit. Mr. Williams told them that he had never been to that store.

178.  Despite not being the investigators on the Shinola case, the officers nonetheless also asked Mr. Williams when he had last been to a Shinola store. Mr. Williams told the officers that he recalled being there once, in 2014, on his brother-in-law's birthday.

179.  In response, one of the officers showed Mr. Williams a sheet of paper with an enlarged still of the Shinola surveillance footage on it. The officer then asked Mr. Williams if he wanted to tell the truth and tell them when he had last been to the Shinola store.

180.  Amazed, Mr. Williams held up the paper to his face and said something to the effect of, "That's not me at all. Y'all can't tell that?"

181.  At that point, the officers turned over the facial recognition lead sheet, which showed the surveillance footage still and Mr. Williams's expired driver's license photo. As the officers kept showing Mr. Williams more photos from the various thefts they were investigating, Mr. Williams kept repeating that it was not him depicted.

182.  The officers seemed surprised, and after seeing Mr. Williams hold the photo up next to his face, the officers realized that he was not the person in the images.

42

183. Despite their acknowledgement of his wrongful arrest, the officers said they did not have the authority to release Mr. Williams.

184. Mr. Williams then returned to the holding cell, where he was kept with roughly forty other men. Mr. Williams sensed tension brewing in the room, which led him to wonder what he would do if someone tried to physically assault him.

185. Mr. Williams, increasingly sad and nervous, called his wife. He told her that the officers realized he wasn't the person they were looking for, but could not promise him that he'd be released that day. He told her that if he was not released that day, he would likely spend the weekend, which included his birthday, in jail for a crime that he did not commit.

186. Finally, after approximately eight more hours, Mr. Williams was released subject to a personal bond.

187. The Detroit Detention Center does not allow those released from custody to wait indoors. So, Mr. Williams had to wait outside on a rainy January night as his wife arranged childcare for their daughters and then drove from their home, roughly thirty minutes away.

188. Finally, his wife arrived. Mr. Williams's thirty hours as a prisoner was over.

Consequences of Wrongful Arrest and Incarceration

189. As Mr. Williams sat in the passenger seat of his car heading home, he was
relieved but realized that his ordeal was far from over.

190. Mr. Williams thought first about his daughters. He knew that they had
watched their father arrested, and he was worried about their well-being.

191. He also recognized that he was still facing charges for retail fraud, and given
the fact that he had already been falsely arrested for the crime, he was not
confident that he would be acquitted.

192. Mr. Williams also worried that he would face professional repercussions
because of his arrest, and wondered about how he would explain what
happened to his employer.

193. Given the fact that he was arrested in plain view of his neighbors, Mr.
Williams also worried about how his neighborhood would treat him and his
family.

194. When Mr. Williams came home, he immediately noticed changes.

195. Prior to his arrest, the family displayed in their living room a canvas portrait
of the family. Mr. Williams noticed that the portrait had been turned around.
When he asked his wife why the portrait was flipped over, he discovered
that J.W. had flipped it around because she and her sister cried every time
they saw it.

196. For weeks after Mr. Williams returned home, J.W. and R.W. cried around their father, and J.W. asked him when the police would come and take him away again. They also began playing cops-and-robbers type games, in which his daughters told Mr. Williams that he was the robber because he stole something.

197. Mr. Williams returned home the day before his birthday. He spent his birthday despondent, trying to figure out a way to create a sense of normalcy for himself and his daughters.

198. Alongside trying to calm his daughters, Mr. Williams had to worry about hiring counsel.

199. The first few lawyers that Mr. Williams approached did not seem interested in his case, but told him that they would represent him in exchange for a hefty fee. Not having a trusted lawyer while life-altering charges hung over his head left him extremely nervous.

200. While charges were pending, Mr. Williams's employment status hung in the air. Though he continued to attend work when he wasn't looking for lawyers, Mr. Williams was certain that he'd lose his job if he was convicted, and was not sure what would happen to his job status if he were put on probation or pled to a lesser offense.

201. Fortunately, Mr. Williams eventually secured legal representation, and attorney Victoria Burton-Harris represented Mr. Williams at his probable cause conference on January 23. At that conference, the Wayne County Prosecutor's Office dismissed all charges against Mr. Williams. However, they did so without prejudice, reserving the right to refile charges against him. No one apologized to Mr. Williams or explained that his case was being dismissed because he had been wrongfully identified as the suspect by a computer—exacerbated by shoddy detective work and a lack of institutional training and supervision.

202. Mr. Williams and his family still feel the lasting effects of the wrongful arrest.

203. To this day, both of his daughters are still shaken to tears whenever they think of what happened to their father. Both Mr. Williams and his wife take pains to avoid exposing their daughters to things that remind them of the wrongful arrest, such as police. Nonetheless, watching their father be arrested on their front lawn was the children's first encounter with the police. The Williams family understandably worry how this will impact their daughters' attitudes and development as they grow up.

204. Neighbors have inquired about the incident, which has brought Mr. Williams embarrassment.

46

205.  Of course, Mr. Williams also remains distressed by what happened. Not only is he continuously pained by the indignity of being arrested, he worries about being wrongfully arrested again. He is confident that, should facial recognition continue to be used without adequate oversight, training, and standards, wrongful arrests will continue to happen. And he is deeply fearful that he will again be wrongfully arrested as a result, especially since his photos remain in the police matching database that led to his wrongful arrest and because the DPD uses the same facial recognition technology as the MSP that falsely identified him.

206.   Mr. Williams is also deeply aggrieved by the fact that DPD chose to use, and continues to use, technology that is more likely to misidentify him because of his race. He does not believe that he should have to live with a greater fear of arrest and thus experience less benefit from police services because of his race, and is distressed that DPD uses demonstrably racially biased technology. This has impacted and will continue to impact Mr. Williams's family life because his daughters now associate the police with their father's false arrest rather than as a source of protection.

207.  Mr. Williams has since been diagnosed with PTSD caused by the events detailed in this complaint.

208.  As a result of his PTSD, Mr. Williams experiences anxiety and panic

attacks, among other symptoms.

## FACTUAL ALLEGATIONS REGARDING DPD'S EVER-CHANGING FACIAL RECOGNITION POLICY

### DPD had no facial recognition policy upon initial adoption of the technology, had no quality control provisions whatsoever, and did not provide adequate training to DPD personnel.

209.  Until April 2019, DPD had no policy in place governing the use of facial

recognition technology. Its use was encouraged freely whenever an officer

thought it might be useful.

210.  Thus, no policy on use of facial recognition technology was in effect when

Detective Adams submitted a probe image for use in a facial recognition

search in March 2019, as described in paragraph 75.

211.  DPD proposed a draft policy in January 2019 that was not ultimately

adopted. This draft policy did not provide meaningful restrictions,

limitations, or information on the use of facial recognition technology.

### DPD implements revised facial recognition technology policies.

212.  In April 2019, under public pressure resulting from the disclosure of its

previously unregulated use of facial recognition technology, DPD instituted

two policies on facial recognition technology. One policy, issued on April 9,

2019, was a training directive that primarily focused on traffic light-mounted

cameras but contained two short provisions addressing facial recognition

technology (the "April training directive"). On April 1, 2019, the Crime

Intelligence Unit ("CIU") instituted a new standard operating procedure

governing the use of facial recognition technology, codified as Section 8 of

the DPD CIU's Standard Operating Procedure (the "April CIU SOP").

213. As described in paragraphs 84-85, when Defendant Bussa assumed

responsibility for the Shinola investigation, the April training directive and

the April CIU SOP were in effect. However, detectives outside of the CIU

were not required to have knowledge of or abide by the April CIU SOP.

214. The April training directive devoted two and a half pages to proper

procedure regarding use of traffic light-mounted cameras. The section

devoted to facial recognition technology in the same directive consisted of

just two sentences and offered no meaningful guidance on how, why, or

when to use facial recognition technology.

215. Instead, it merely provided that "DPD members will not use facial

recognition technology unless that technology is in support of an active or

ongoing criminal or homeland security investigation."

216. The sole other provision in the policy allowed use of facial recognition

technology on a person with a minimal evidentiary threshold: "reasonable

suspicion that such use of facial recognition technology will provide

information relevant to an active or ongoing criminal or homeland security investigation."

217. Section 8.7(b) of the April CIU SOP introduced quality control standards, requiring CIU examiners to "analyze, review, and evaluate the quality and suitability of probe images, to include factors such as the angle of the face image, level of detail, illumination, size of the face image, and other factors affecting a probe image prior to performing a face recognition search."

218. Further, section 8.5(d)(vi) of the April CIU SOP required that possible facial recognition leads be reviewed by a second "authorized, trained examiner" before disseminating results to the requester.

219. However, the policy did not require retroactive review of facial recognition leads produced before the policy was implemented. This, despite the fact that Section 8.7(c) of the April CIU SOP recognized that "the integrity of information depends on quality control and correction of recognized errors which is key to mitigating the potential risk of misidentification or inclusion of individuals in a possible identification."

220. Section 8.5(d)(viii)(g) of the April CIU SOP also provides the important disclaimer that "the result of a facial recognition search provided by the Detroit Police Department is only an investigative lead and is NOT TO BE

CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT"
(Capitalization in original).

221.   Thus, the April CIU SOP put the CIU, but *not* investigators, such as

Defendant Bussa, on notice of the importance of probe image quality, the

necessity of peer review, and the fact that a facial recognition lead was not to

be considered a positive identification—including for facial recognition

leads produced prior to the April training directive or CIU SOP.

Accordingly, DPD was clearly aware of the dangers of unconstrained use of

facial recognition technology, but it took no effort to make their detectives

and officers aware of such dangers or to correct cases that already relied on

the technology.

222.   Additionally, the April CIU SOP did not require DPD personnel to apply its

quality control standards to images sent to the Michigan State Police for

facial recognition searches, nor did it require DPD personnel to apply the

April CIU SOP's peer review procedures to investigative leads returned by

the Michigan State Police after a facial recognition search.

Detroit proposes new policies before Mr. Williams's arrest.

223.   In late April 2019, DPD proposed a manual directive that would have

codified the provisions of the April training directive addressing facial

recognition technology. This would have been the first manual directive

51

specifically addressing facial recognition technology. This proposal was never adopted or incorporated into the Department's policy manual.

224. In July 2019, DPD proposed a more detailed manual directive on facial recognition technology. This again would have been the first manual directive specifically addressing facial recognition technology.

225. The proposed July 2019 policy would have barred facial recognition technology from being used for anything other than active or ongoing Part 1 violent crime or home invasion investigations. The policy also would have required CIU to peer review any investigative lead with another analyst *and* a supervisor. It also described any violation of the directive as "major misconduct" subject to discipline including dismissal from DPD.

226. The policy would have regulated facial recognition requests that CIU analysts sent or intended to send to the Michigan State Police. Before sending a facial recognition request to the Michigan State Police, the policy would have required an analyst to have their request approved by a CIU supervisor.

227. The policy, if implemented, would have been the first time DPD was required to track and maintain data regarding its use of facial recognition technology. The policy would have required DPD to send the Board of Police Commissioners weekly reports on statistics regarding the use of facial

recognition technology, including "requests that were fulfilled, the crimes that the facial recognition requests were attempting to resolve, and the number of leads produced from the facial recognition software."

228. The July policy proposal did not provide for any retroactive review of ongoing investigations or any active warrants issued in cases that used facial recognition technology under earlier policies.

229. Regardless, the proposed July policy was never adopted into an official policy. Despite recognizing the dangers inherent in unregulated facial recognition requests by detectives, the proposal never went beyond review by the Board of Police Commissioners. DPD did not take any other measures to make department personnel aware of the dangers reflected in the proposed policy.

<u>Detroit institutes new policy (the "September policy") before Mr. Williams's arrest.</u>

230. On September 19, 2019, less than a month after the warrant issued for Mr. Williams's arrest, DPD finally implemented Manual Directive 307.5 (the "September policy").

231. Section 307.5 - 5.2 of the policy strictly limited facial recognition use to active or ongoing Part 1 violent crime or home invasion investigations.

232. The September policy expressly regulated facial recognition requests that DPD officers send to external agencies, such as the Michigan State Police. Before sending a facial recognition request to the Michigan State Police, section 307.5 - 5.4(2) requires a CIU analyst to have their request approved by a CIU supervisor.

233. The September policy also introduced more robust peer review measures. Section 307.5 - 5.4(3) demands that investigative leads receive two levels of peer review before the lead is disseminated.

234. However, the September policy did not provide for any retroactive review of ongoing investigations or any active warrants issued in cases that used facial recognition technology under earlier policies.

235. In December 2022, DPD reissued Manual Directive 307.5, with contents identical to the September policy. That policy remains in effect today.

   City of Detroit concedes fault, candidly discusses its failings.

236. At a July 9, 2020, Detroit Board of Police Commissioners meeting, DPD and City of Detroit employees were given latitude to speak freely about Mr. Williams's wrongful arrest. At the meeting, Lawrence Garcia, then the City of Detroit Corporation Counsel, stated that "this is an exceptional case. I'm not a cop, but of course Chief Craig is, and he said this is not a defensible

54

case, so we would be conceding liability. And there's no harm in speaking frankly about the facts of this case."

237. Addressing the board, officials admitted error at every step of the Shinola investigation.

238. Then-Chief Craig acknowledged how unreliable facial recognition technology is. He stated that "if you just rely solely on facial recognition technology, there's a high probability that it's going to misidentify."

239. Both then-Chief Craig and then-Assistant Chief White, who oversaw DPD policy, spent time addressing the weaknesses in the DPD's earlier April policies that had led to Mr. Williams's wrongful arrest.

240. Then-Chief Craig stated that if DPD had adopted its September policy earlier, "I am convinced [the wrongful arrest] would not have happened." Then-Assistant Chief White echoed these thoughts, stating that "if the current policy . . . would have been in place, this incident would not have happened."

241. Then-Chief Craig conceded that the probe image was inappropriate for facial recognition use. He admitted that the photograph was "blurry," and expressed his belief that "under [the September policy], a blurry image would not be used in facial recognition."

242. Then-Assistant Chief White concurred with then-Chief Craig, and used his time to focus on other weaknesses in the April policies. He addressed the fact that the earlier policies did not explicitly require further investigation after a facial recognition lead or peer review of such a lead.

243. DPD officials also used their time at the meeting to assess how Defendant Bussa handled the investigation.

244. Then-Chief Craig said "this was clearly sloppy, sloppy investigative work. There's no other way for me to say it but that way."

245. Turning specifically to Defendant Bussa's request for warrant, then-Chief Craig explained that "what was left out [of the warrant is] the person that made the pick in the photo array was not a direct witness. In fact, the security staff member wasn't even there when the theft took place . . . And we know there's another case emerging out of the same precinct with the same detective [Defendant Bussa]. And so that's causing us deep concern."

246. DPD Associate Director Christopher Graveline also admitted that Defendant Bussa was far from forthright regarding his evidence. Graveline explained that Defendant Bussa arranged a photographic lineup with a "security officer [who] was not present, and was actually picking off of the security video. And [] that fact was not included as part of the investigator's report submitted to the Wayne County Prosecutor's Office."

247.  Speaking further about what Defendant Bussa submitted to the Wayne
County Prosecutor's Office and the magistrate, Graveline stated that "it does
not include many details other than a theft occurred at Shinola, what was
taken from Shinola, that there was video, and that a person from the security
firm had picked out Mr. Williams as the perpetrator. It did not mention that
it was not an in-person pick or any of that information."

248.  In short, Mr. Williams's wrongful arrest resulted from a combination of
what DPD officers acknowledged was "sloppy, sloppy investigative work";
a "blurry" photograph; DPD policies that did not regulate probe image
quality, demand peer review, or further investigative work; and Defendant
Bussa's RFW, which misrepresented evidence and omitted mention of key
details.

<u>The Williams arrest is part of a troubling pattern in which Defendants have abused
facial recognition technology.</u>

249.  Unfortunately, what happened to Mr. Williams was no isolated incident.

250.  On May 15, 2019, Defendant Bussa was assigned to investigate a reported
assault and larceny.

251.  The victim recorded a video of the incident on his cellphone, and turned that
video over to Defendant Bussa.

252.  Defendant Bussa then captured a still image from the video, showing the alleged perpetrator's face, and sent it in to the Detroit Police Department's Crime Intelligence Unit.

253.  The facial recognition search returned Michael Oliver as an investigative lead.

254.  The investigative lead report does not include the "score" indicating how confident the system is that Mr. Oliver is the person pictured in the probe image, but does contain the disclaimer signifying that a result from a facial recognition search "is only an investigative lead and is NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT" (capitalization in original).

255.  In reality, Michael Oliver was not the person pictured in the probe image.

256.  But the facial recognition system suggested the wrong person in part because the individual in the probe image is Black, and the technology has proven to misidentify Black people at far higher rates than white people.

257.  Defendant Bussa then compiled a six-pack photo array that included Mr. Oliver's picture.

258.  As was the case in the Shinola investigation, Defendant Bussa dispatched Detective Posey to conduct a six-pack photo array identification.

58

259. And, similarly, the identification procedure wasn't conducted blindly — Detective Posey knew that Mr. Oliver was the person of interest.

260. Again, the person sitting across from Detective Posey picked the same individual that the facial recognition system had identified as an investigative lead.

261. Defendant Bussa then wrote out a RFW to present to the Wayne County Prosecutor's Office and magistrate judge.

262. Like the RFW that Defendant Bussa produced for Mr. Williams, the RFW does not disclose any information about the quality of the probe image, the "score" associated with the facial recognition system's search, that facial recognition systems are prone to misidentifying Black people, and that facial recognition results are not to be considered positive identifications per departmental policy. Nor did the RFW disclose to the magistrate that Mr. Oliver's arms are covered in numerous tattoos—and that the cell phone video clearly showed that the person who grabbed the cellphone did *not* have any such tattoos.

263. After reviewing the RFW, a magistrate issued an arrest warrant for Mr. Oliver.

264. On July 31, 2019, the very day Defendant Bussa wrote out his RFW to arrest Mr. Williams, Mr. Oliver was arrested while driving to work.

265. Mr. Oliver spent three days in police custody.

266. Two weeks later, a prosecutor dismissed charges against Mr. Oliver after recognizing that Mr. Oliver is not the person pictured in the probe image.

## FACTUAL ALLEGATIONS REGARDING DPD'S PERSISTENT FAILURE TO TRAIN AND SUPERVISE OFFICERS

267. When Defendant Bussa became a detective, DPD provided him with no training on facial recognition technology or procedures for making facial recognition requests, no training on proper lineup procedures, no training on drafting and submitting warrants, no training on probable cause or what constitutes sufficient evidence to establish probable cause, and no training on any investigatory skills necessary for being a detective.

268. In fact, upon information and belief, between at least 2017 and 2020, DPD did not provide any newly minted detective with any type of formalized training. DPD obviously recognizes the importance of such trainings: at some time prior to 2017, DPD provided detective trainings and at some time after 2020, it began to do so again in the form of a "detective school." Yet, the "detective school" was shuttered for at least three years, including when Defendant Bussa became a detective. And despite DPD's decision to begin offering detectives training again, Defendant Bussa has still not been required to attend "detective school" or participate in any detective trainings.

269. Further, Defendant Bussa, like many detectives, was told by his supervisors and peers that most training and learning would happen on the job, primarily through brief conversations about ongoing cases with fellow detectives. Yet he was thrown into his work and, almost immediately upon becoming a detective, received the Shinola theft case and was told to move it along without any guidance or training.

270. Of course, Defendant Bussa might have learned something from veteran detectives, but DPD had a deep-rooted custom of letting the "officer-in-charge" handle every aspect of a case using their own preferred tactics and without much guidance or input from more experienced detectives or supervisors unless such guidance was clearly asked for. In addition, Defendant Bussa often received conflicting advice on investigatory techniques from his fellow detectives.

271. The custom was so deeply rooted that officers would not correct Defendant Bussa even when they saw him conduct an investigation in ways they thought might not be appropriate, such as conducting a photo lineup with a person who was not an eyewitness.

272. DPD officers did participate in a police academy when they first joined the department, but the police academy is a short program typically attended

immediately upon becoming a police officer—usually many years before a person is promoted to detective.

273. Further, upon information and belief, DPD personnel are not held accountable for failing to read the DPD policies. In the abstract, personnel are required to read new policies, but personnel need only check a box on their computer to confirm they have "read" a new policy. There are no systems or processes in place to ensure actual compliance.

<u>Failure to Train and Supervise on Probable Cause</u>

274. DPD instituted no required training for detectives on what probable cause is or what evidence is sufficient to establish probable cause.

275. DPD had no way of ensuring that its detectives and officers read policies on probable cause or remembered their limited police academy training on probable cause from years prior.

276. Upon information and belief, supervising officers rarely offered guidance on what was necessary to include in a warrant request, including whether to include exculpatory evidence, whether enough evidence was contained in a warrant packet, or whether certain facts or omissions may mislead a magistrate.

277. Because, in part, of the lack of training and lack of a system to ensure that detectives read policy directives, Defendant Bussa did not adhere to the probable cause policies of DPD.

278. DPD's failure to supervise and train on probable cause was one of the central factors leading to the false arrest and imprisonment of Mr. Williams.

Failure to Train and Supervise on Proper Photographic Lineup Procedures

279. DPD instituted no required training for detectives on how to conduct a photo lineup, on the reliability or unreliability of witnesses, on the definition of eyewitness, on racial bias in witness identifications, or on the importance of avoiding conditions that might—consciously or unconsciously—lead a witness toward a specific suspect.

280. DPD had no way of ensuring that its detectives and officers read policies on lineups or remembered their limited police academy training on lineups.

281. Because, in part, of the lack of training and lack of a system to ensure that detectives read policy directives, and because of the lack of clarity in relevant policies, detectives like Defendant Bussa were allowed to conduct photo lineups in improperly suggestive ways that were more likely to produce false identifications, including:

    a.    conducting non-blind lineups;

  b.  allowing the officer in charge of an investigation to conduct lineups or be present in the room during lineups;

  c.  allowing non-eyewitnesses to participate in lineups;

  d.  conducting lineups based only upon an investigative lead that was generated by facial recognition technology;

  e.  informing the witness prior to the lineup that facial recognition technology had produced a "match" or "hit"; and

  f.  allowing the witness to view a photo or video while reviewing the photo lineup.

282. DPD provided no training or supervision to detectives and officers on recording photographic lineups by video or audio means, and it did not train or supervise detectives and officers to solicit or record an identifying witness's confidence level in the photo selected.

283. Because, in part, of the lack of training and lack of a system to ensure that detectives read policy directives, Defendant Bussa did not adhere to the witness identification policies of DPD.

284. DPD's failure to supervise, train, and create proper policies on eyewitness lineups was one of the central factors leading to the false arrest and imprisonment of Mr. Williams.

Failure to Train and Supervise on Proper Warrant Request Procedures

285. DPD instituted no required training for detectives on how to prepare and submit a valid request for warrant.

286. DPD had no way of ensuring that its detectives and officers read policies on submitting warrant requests or remembered their limited police academy training on warrant procedures.

287. DPD, by failing to train and supervise detectives and officers, allowed its employees to submit improper warrant requests lacking probable cause.

288. DPD did not train its detectives on their legal obligation to disclose known exculpatory information to prosecutors and magistrates when requesting a warrant.

289. DPD's detectives and officers, including Defendant Bussa, have shown a clear and persistent lack of understanding of proper warrant request procedures.

290. Because, in part, of the lack of training and lack of a system to ensure that detectives read policy directives, Defendant Bussa did not adhere to the warrant request policies of DPD.

291. Further, while DPD did require supervisor sign-off on warrant requests before submission to the prosecutor's office, at the time of Mr. Williams's arrest, DPD had no policy in place to prevent supervising officers with no

investigatory experience and no information at all about a case from

approving such warrants.

292.  DPD's failure to supervise, train, and create proper policies on warrant

request submission procedures was one of the central factors leading to the

false arrest and imprisonment of Mr. Williams.

## CAUSES OF ACTION

293.  Plaintiff incorporates the above allegations as if fully set forth herein.

### Count I
### False Arrest and Imprisonment in Violation of the Fourth Amendment
### and 42 U.S.C. § 1983
(Defendant Bussa)

294.  The Fourth Amendment to the United States Constitution guarantees the

right of the people "to be secure in their persons … against unreasonable …

seizures" and demands that "no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation."

295.  In providing that warrants may issue only upon probable cause, the Fourth

Amendment requires that the investigating officer will present their evidence

in good faith. Consequently, the law clearly recognizes that an officer who

obtains a warrant under false pretenses violates the constitutional rights of

the individual against whom that warrant issues.

296. Applying clearly established law, a reasonable officer in Defendant Bussa's position would have known that they did not have probable cause to seek a warrant to arrest Mr. Williams.

297. Indeed, Defendant Bussa obtained an arrest warrant only because he knowingly or recklessly misrepresented both the nature of Katherine Johnston's identification and the reliability of the facial recognition result.

298. Because Defendant Bussa knowingly and recklessly misrepresented and omitted key facts about his evidence, a magistrate authorized a warrant to arrest Mr. Williams.

299. By failing to disclose obviously exculpatory information that was known to him at the time of the warrant request to procure an arrest warrant where no probable cause existed, Defendant Bussa invaded the liberty guaranteed to Mr. Williams by the Fourth Amendment.

**Count II**
*Monell* Liability for False Arrest and Imprisonment in Violation of the Fourth
Amendment and 42 U.S.C. § 1983
(Defendants City of Detroit and Chief White in His Official Capacity)

300. Under 42 U.S.C. § 1983, municipal defendants are "persons" liable for their unconstitutional policies, customs, and practices.

301. Mr. Williams was injured and had his Fourth Amendment right to be free of unreasonable seizures violated because DPD established inadequate policies,

failed to train officers and detectives, and exhibited a custom of

acquiescence regarding detectives' deficient investigatory techniques.

302.   No policy regarding facial recognition was in place when Detective Adams

submitted his facial recognition request or when the facial recognition search

was conducted. Thus, DPD allowed facial recognition searches without

regard for probe image quality. Once a search produced results, there were

no guardrails such as peer or supervisor review. Moreover, there were no

policies regulating facial recognition requests sent to external agencies.

303.   The flaws and weaknesses of facial recognition technology were both

knowable and known at the time the facial recognition search was

conducted, and at the time that the DPD developed and implemented its

April 2019 policies, which did not require DPD personnel to re-examine any

searches conducted prior to April 2019, creating an intolerable risk that

searches conducted prior to the April policies would result in a false arrest.

304.   Given the publicly known flaws of facial recognition technology, combined

with then-Chief Craig's admission that facial recognition technologies are

prone to misidentifying individuals, then-Chief Craig and Defendant City of

Detroit caused Robert Williams's injuries and violated his Fourth

Amendment rights by failing to guard against foreseeable errors and their

consequences.

305.   DPD's September policy regarding facial recognition made some improvements, but did not require a retroactive review of searches conducted prior to September 2019, creating an intolerable risk that searches conducted prior to the September policy would result in a false arrest.

306.   Moreover, DPD did not adequately train or supervise any of its personnel, including Defendant Bussa, in key investigatory skills, such as witness identifications, probable cause, submission of warrant requests, and acceptable use of facial recognition technology. Instead, DPD adopted a laissez-faire attitude allowing detectives to conduct their investigations as they saw fit, with little oversight and few, if any, guardrails.

307.   DPD knew and was in possession of information notifying them of the importance of probe image quality for generating reliable leads. Then-Chief Craig possessed information that facial recognition technology will not work as intended if certain factors are met. However, the City of Detroit and DPD did not adequately train officers to ensure that foreseeable errors were avoided.

308.   The probe image used is inarguably deficient for use in facial recognition technology. At least four DPD officials – Defendant Bussa, Detective Adams, Analyst Yager, and Detective Posey – saw the probe image used and decided to rely on it. Because the City of Detroit and DPD knowingly

permitted use of facial recognition technology without adequately training

those who would use or rely on facial recognition technology, the low-

quality probe image was sent to the Michigan State Police, and was

subsequently heavily relied on, leading to Mr. Williams's false arrest.

309.   DPD created an atmosphere of lax requirements with regard to reading and

adhering to directives and policies and, regardless, failed to develop

adequate policies in the first instance.

310.   DPD's failure to train and supervise allowed officers and detectives like

Defendant Bussa significant leeway to handle cases improperly, including

misusing and abusing tools like facial recognition technology, improperly

conducting photo lineups, and improperly submitting requests for warrants,

failures which ultimately led to the wrongful arrest of Mr. Williams.

311.   DPD's failure to implement adequate policies governing the use of facial

recognition technology, despite creating a culture of reliance on facial

recognition to solve crimes, allowed personnel to misuse and abuse facial

recognition technology. For example, the failure to implement adequate

policies allowed detectives to submit poor quality videos and photos to the

Crime Intelligence Unit and to rely on the results of facial recognition

searches with little doubt or hesitation. The CIU, too, was able to pass poor

quality photos onto MSP without pause. DPD's lack of adequate policies

also led to a practice of detectives conducting photographic lineups based on no information other than a facial recognition "match" or "hit"—with the concomitant and obviously high likelihood of generating a false positive lineup identification.

312.   Given the weight DPD placed on facial recognition searches, as both Mr. Williams's and Mr. Oliver's cases evidence, the failure to regulate the use of facial recognition technology or train its employees about the technology amounts to deliberate indifference to the plight of those who would be erroneously "identified" and included in six-pack photo lineups, where there would be significant chance that they'd be identified once more, particularly given that their inclusion in such a lineup is likely to look *something* like the suspect precisely because of having been identified as a potential match by the facial recognition technology.

313.   On September 13, 2019, the Wayne County Prosecutor's Office dropped charges against Mr. Oliver, putting DPD on notice of gaps in its earlier policies and training programs.

314.   Six days later, DPD promulgated the September policy which provided for no retroactive review of facial recognition use under earlier policies. The lack of retroactive review, despite the notice of the unlawful effects of

earlier policies and practices, amounts to tacit approval of facial recognition use under the earlier policies.

**Count III**

Mich. Comp. Laws § 37.2302: Violation of the Elliott-Larsen Civil Rights Act
(Defendant Chief White in His Official Capacity and Defendant Bussa)

315.   The Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302, states that, "except where permitted by law, a person shall not (a) [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."

316.   The Detroit Police Department is a public service within the meaning of the statute. Mich. Comp. Laws § 37.2301 defines "public service" to be "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof."

317.   By employing technology that is empirically proven to misidentify Black people at rates far higher than other groups of people, the DPD denied Mr. Williams the full and equal enjoyment of the Detroit Police Department's services, privileges, and advantages because of his race or color.

**Count IV**

<u>False Arrest and Imprisonment in Violation of the Michigan Constitution and Michigan Common Law</u>

(Defendant Bussa)

318.   The Michigan Constitution, like the Constitution of the United States, demands that there be probable cause to arrest individuals. There was no probable cause that Mr. Williams committed a crime.

319.   As detailed in Count I, Defendant Bussa knowingly or recklessly misrepresented and omitted information in the affidavit that was material to the magistrate's decision to issue an arrest warrant.

320.   Defendant Bussa's false statements and omissions led to Mr. Williams's wrongful arrest and imprisonment, and so Defendant Bussa committed the Michigan state law tort of false arrest and imprisonment.

**RELIEF REQUESTED**

321.   Wherefore, Plaintiff prays for:

    a.    Damages as may be proven at trial to compensate Plaintiff for all pain, suffering, humiliation, shame, embarrassment, and emotional distress caused by being falsely arrested and imprisoned.

    b.    Damages as may be proven at trial to compensate Plaintiff for lost wages caused by the unlawful arrest and imprisonment.

    c.    All punitive and exemplary damages as may be proven at trial.

73

d.    Interest on all sums awarded to Plaintiff from the date of the events and/or losses.

e.    An award of Plaintiff's reasonable attorneys' fees and costs of this action, pursuant to 42 U.S.C § 1988, Mich. Comp. Laws § 37.2802, and any other applicable law.

f.    A judgment declaring that Defendants:

    i.    violated Plaintiff's rights under the Fourth Amendment of the U.S. Constitution;

    ii.    violated Plaintiff's rights under the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302;

    iii.    violated Plaintiff's rights under the Michigan Constitution and Michigan Common Law.

g.    An injunction requiring that DPD personnel using facial recognition technology or its results must disclose to the magistrate:

    i.    the probe image used to generate a "match" or "hit";

    ii.    that facial recognition technology's accuracy depends on the ability to discern facial details, and so depends on the probe image's image quality, lighting, face angle, and face obstructions;

    iii.       that error rates increase as the quality of the probe image

                 decreases;

    iv.       the error rates associated with the relevant facial

                 recognition algorithm, by race and gender;

    v.        that a facial recognition "match" or "hit" is not

                 considered a positive identification of the suspect.

    vi.       all other information regarding the validity of and

                 confidence with which a facial recognition "match" or

                 "hit" was generated.

h.    An injunction requiring that DPD personnel conducting or

arranging a photographic lineup procedure must:

    i.        conduct or arrange the lineup procedure in a double-blind

                 manner, with neither the conducting officer nor the

                 witness aware of whether the photo array contains the

                 suspect;

    ii.       ensure that the conducting officer and any other officers

                 present in the room during the lineup are not the officer

                 who arranged the lineup or the officer in charge of the

                 investigation;

    iii.       use an actual eyewitness in the lineup and not allow a

                non-eyewitness to participate in the lineup;

    iv.       not conduct a lineup based only upon an investigative

                lead that was generated by facial recognition technology;

    v.       not inform the witness prior to the lineup whether facial

                recognition technology had produced a "match" or "hit";

    vi.       not allow the witness to use a photo of the suspect or

                another external reference for comparison with the

                photos in the photo array;

    vii.      record the lineup procedure by video and audio means;

    viii.     ask the witness, upon making an identification during the

                lineup procedure, for their confidence level in their photo

                selection, and document that confidence level.

i.     An injunction requiring Defendants to institute formal and

    specialized training to all officers and detectives on:

    i.       Probable cause—as defined by prevailing case law and

                contemporary best practices—including the importance

                of considering exculpatory evidence, the difference

                between probable cause and reasonable suspicion, and

                the importance of complete and accurate disclosure or

both inculpatory and exculpatory evidence to a

prosecutor and to a magistrate;

    ii.    Proper eyewitness identification procedures, in accord

with prevailing case law and contemporary best

practices;

    iii.    Proper warrant request procedures, in accord with

prevailing case law and contemporary best practices.

j.    An injunction prohibiting Defendants from using facial recognition

technology as an investigative technique so long as it misidentifies

individuals at materially different rates depending on race,

ethnicity, or skin tone.

k.    An injunction prohibiting Defendants from performing, or causing

any other law enforcement agency to perform on their behalf, any

facial recognition search using any database in which any images

of Mr. Williams are included.

l.    Any further or other relief the Court deems just and proper.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Ben Mordechai-Strongin*
Lauren Yu*
William Ellis*

Mickey Terlep*
Julia Kahn*
CIVIL RIGHTS LITIGATION INITIATIVE
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
bmstrong@umich.edu
laurenyu@umich.edu
wwellis@umich.edu
mterlep@umich.edu
jekahn@umich.edu

* Student Attorney practicing pursuant to
Local Rule 83.21

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
Ramis Wadood (P85791)
American Civil Liberties Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org
rwadood@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

Counsel for Plaintiff

Dated: 06/23/2023

**JURY DEMAND**

Plaintiff requests a trial by jury in this matter.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Ben Mordechai-Strongin*
Lauren Yu*
William Ellis*
Mickey Terlep*
Julia Kahn*
CIVIL RIGHTS LITIGATION INITIATIVE
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
bmstrong@umich.edu
laurenyu@umich.edu
wwellis@umich.edu
mterlep@umich.edu
jekahn@umich.edu

* Student Attorney practicing pursuant to
Local Rule 83.21
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
Ramis Wadood (P85791)
American Civil Liberties Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org
rwadood@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

Counsel for Plaintiff

Dated: 06/23/2023